Eric C. HAUSER and Harvey Minars, Plaintiffs,

v.

WESTERN GROUP NURSERIES, INC. and Western United Nurseries, Inc., Defendants.

No. 86 Civ. 9697 (SWK).

United States District Court, S.D. New York.

April 9, 1991.

478

Pollack & Greene by Michael E. Greene, New York City, for plaintiff Eric C. Hauser.

Jones, Day, Reavis & Pogue by Carl F. Goodman, New York City, for plaintiff Harvey Minars.

Morrision Cohen Singer & Weinstein by Donald Chase, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

Plaintiffs Eric C. Hauser ("Hauser") and Harvey Minars ("Minars") seek a declarato-

ry judgment in this diversity action exonerating them from personally liability on a certain wraparound partnership note held by defendant Western Group Nurseries, Inc. ("WGN"). The parties have conducted extensive discovery. Plaintiffs now move, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting them partial summary judgment seeking a determination that although WGN may now be the present holder of the wraparound partnership note, WGN took the note subject to a certain contractual limitation expressly precluding plaintiffs' personal liability. Defendants cross-move pursuant to Rule 56 for summary judgment declaring plaintiffs personally liable on the wraparound note and seek leave, pursuant to Rules 13 and 15 of the Federal Rules of Civil Procedure, to serve an amended answer and counterclaim.

## BACKGROUND

*The Asset Purchase Transaction*

Arizona World Nurseries Limited Partnership ("Arizona World") is an Arizona tax shelter limited partnership, organized in November 1984 to engage in the nursery business previously conducted by defendant Western United Nurseries, Inc. ("WUN").[1] Hauser is one of Arizona World's 200 or so limited partners (the "Limited Partners"). Minars is Arizona World's general partner.

Based upon a tax opinion by Arthur Andersen & Company, Arizona World offered subscribing limited partners "a tax loss of approximately 350% as a percent of cash outlay for 1984" premised upon each subscriber's pro-rata personal liability on a wraparound partnership note dated December 31, 1984 issued by Arizona World to World Nurseries, Inc. ("World") (the "Wraparound Note") in connection with the acquisition of WUN's business. Arizona World represented that for purposes of Regulation D under the Securities Act of 1933 and Section 465 of the Internal Revenue Code, each limited partner would be liable, or "at risk," for his or her pro-rata share of the Wraparound Note, equalling $260,000 per unit of partnership interest.

The purchase and sale of WUN's business was structured so that Arizona World would purchase the nursery stock, plant materials and other nursery assets (collectively, the "Nursery Assets") from World, which would have acquired the Nursery Assets from WUN.[2] In the first transaction, the sale of the Nursery Assets from WUN to World closed for approximately $22.1 million. The purchase price was payable by World as follows: $3 million cash

---

**1.** Arizona World was to acquire the nursery business of various entities in addition to Western United, including Sonora Nursery Sales, Inc., Beardsley Holdings, Inc., and Diversified Agronomics, Ltd. Purchase Agreement, annexed as Exhibit ("Ex.") "6" to Appendix of Exhibits Submitted in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Defendants' Cross–Motion for Summary Judgment ("Def.App.") Vol. I, at 1.

**2.** The Arizona World offering brochure summarizes the acquisition of WGN's business as follows:

[Arizona World] will purchase the Nursery Stock and other plant materials, upon successful completion of the Offering, from World Nurseries who will, in turn, have purchased them from the Western Group. [Arizona World] will also acquire the right to utilize the 482 acres through leases, subleases and maintenance agreements, and acquire the trade names and customer list utilized by the Western Group in its nursery business. The purchase price for the nursery stock and oth-

er plant materials, based on the wholesale value of the nursery stock and other plant materials, is an aggregate of $33 million payable $6,570,000 in cash and the balance by the [Wraparound Note] (which wraps around the note given by [World] to the Western Group) and which bears 9% interest compounded semi-annually and is due January 1, 1997. A portion of the [Wraparound Note] will be assumed by the Partners. *From closing to* December 31, 1988, 100% of [Arizona World] cash flow from the sale of nursery stock and other plant materials (after deducting the cost of restocking) will be applied first to pay accrued interest on the [Wraparound Note] and then to prepay the principal thereof. Thereafter, from January 1, 1989 to December 31, 1996, 50% of cash flow (after deducting the cost of restocking) will be applied to prepay the principal on the [Wraparound Note] and then to unpaid interest thereon, and 50% will be distributed to the Partners in accordance with their interests.
Arizona World Offering Brochure, Def.App. Vol. I Ex. "1" at 3.

upon closing; a non-recourse promissory note of about $17 million (the "Non–Recourse Note"); and the balance of $2.1 million to be paid out of the ongoing sale of certain Nursery Assets. In the second transaction, the sale of the Nursery Assets from World to Arizona World closed for approximately $33 million. The purchase price was payable by Arizona World as follows: $6.5 million cash upon closing and a promissory note (the Wraparound Note) of $26.5 million.

The Non–Recourse Note (given by World to WUN) was secured by various assets pursuant to a security agreement dated December 31, 1984, executed in connection with the WUN/World closing (the "Security Agreement").[3] The Non–Recourse Note provides in relevant part as follows:

> With respect to all sums due hereunder ("Note Obligations"), the Payee [WUN], or any holder or transferee hereof shall have no recourse to the Maker or its assets other than the Collateral specified in the Security Agreement and Payee, any holder of this Note or other transferee thereof shall look solely and only to the Collateral as security for the Note Obligations, and for the payment and performance of the Note Obligations.

Non–Recourse Note, Pl.App. Vol. II Ex. "18," at 6. Under the Security Agreement, WUN, as secured party, received certain collateral (the "Collateral") comprised of a purchase money security interest in the Nursery Assets, the Wraparound Note and the security agreement dated December 31, 1984, executed in favor of World in connection with the World/Arizona World portion of the transaction (the "Partnership Securi-

ty Agreement"). WUN's interest in the Collateral is set forth in the Security Agreement which provides, in relevant part:

> 1. *Security Interest.* To secure the timely payment of the Purchase Price ... [World] shall, and hereby does, grant, convey, assign, pledge and transfer to [WUN], a purchase money security interest in and to the [Nursery Assets] and the Wraparound Note *(except that [WUN] shall not have the right to sue the Limited Partners or General Partners of [Arizona World] personally thereon other than to the extent of payments made to them by [Arizona World])* ... and agrees that such security interest attaches upon the Closing of the Purchase Agreement.

Security Agreement, Def.App.Ex. "5," ¶ 1 (emphasis added).[4] On December 31, 1984, by a document entitled Assignment of Partnership Security Agreement and a Wraparound Note (the "Assignment"), and in accordance with the terms of the purchase agreement entered into between World and WUN dated December 17, 1984 (the "Purchase Agreement"), World assigned and transferred the Partnership Security Agreement and Wraparound Note to WUN. *See* Def.App. Ex. "8". By a notice of assignment of the same date (the "Notice of Assignment"), World advised Arizona World of the Assignment and requested its consent. *See* Def.App.Ex. "9". Arizona World responded by letter also dated December 31, signed by Minars in his capacity as general partner, acknowledging receipt of the Notice of Assignment and granting Arizona World's consent to the

---

**3.** The Security Agreement was Exhibit "K" to the WUN/World Purchase Agreement dated December 17, 1984.

**4.** On December 17, 1984, prior to execution of the Security Agreement, the parties entered into an agreement limiting the liability of the Arizona World limited partners (the "Supplemental Agreement"). The Supplemental Agreement provides in relevant part:

> It is agreed between the parties hereto that the Security Agreement ... between [WUN] ... and [World] will be amended ... to make clear that upon occurrence of an event of default under the Security Agreement, [WUN]

shall only have the right to proceed against the limited partners of [Arizona World] for cash distributions made to them which are not made from Cash Flow (as defined in the Purchase Agreement) from sales of Nursery stock and other plant materials in the ordinary course of business or from payments received on sales made pursuant to Section 15 of the Purchase Agreement.

Supplemental Agreement, annexed as Exhibit "3" to Appendix of Exhibits Submitted in Support of Plaintiffs' Motion for Partial Summary Judgment ("Pl.App.") Vol. I, at 1.

Assignment (the "Acknowledgement").[5] Subsequent to the both closings, in February 1986, World defaulted on its obligations to WUN under the Purchase Agreement by failing to make certain payments thereunder.

## Arizona Proceedings

Shortly after World's default, WUN (and others) commenced an action in the Superior Court for the State of Arizona, Maricopa County (the "Superior Court"), entitled, *Beardsley Holdings, Inc., et al. v. Bryce Corp., et al.,* Index No. C556082 (the "First Arizona Action"), against various parties including Minars, World and Arizona World, seeking to recover the sums owing to it under the Purchase Agreement and Non-Recourse Note. On October 22, 1986, the Superior Court granted WUN's motion for partial summary judgment "foreclosing [WUN's] security interest in all of the collateral described in the Security Agreement entered into between [WUN] and [World]." Third Amended Rule 54 Judgment (the "Judgment"), Pl.App. Ex. "1(d)," at 5. The Judgment also provided for WUN to request that the Clerk of the Court issue a Special Writ of Execution directing the Sheriff to conduct a foreclosure sale of all the collateral described in the Security Agreement. *Id.* On November 5, 1986, the Superior Court issued a Writ of Special Execution to the Arizona Sheriff directing the sale of the Collateral.

Defendants in the First Arizona Action appealed and sought a stay of execution on the Judgment which, on November 19, 1986, the Superior Court denied as moot with respect to foreclosure on the Nursery Assets, and granted with respect to the balance of the foreclosure upon the condition that defendants post a bond of $20 million. *See* Def.App.Ex. "20". By Order dated November 28, 1986, the Arizona Court of Appeals denied a renewed application for a stay of execution. By Memorandum Decision filed on November 10, 1987, the Arizona Court of Appeals affirmed the Judgment.[6]

Pursuant to the Writ of Special Execution, the Arizona Sheriff took possession of the Nursery Assets and Wraparound Note and scheduled a foreclosure sale for December 2, 1986 (the "Foreclosure Sale"). On December 1, 1986, Joseph and Kathleen Tyler formed Western Group Nurseries, Inc. ("WGN"), an Arizona corporation having as its shareholders WUN and its affiliates.[7] Also on December 1, WUN commenced a second action in the Superior Court against Arizona World, Minars, Hauser and each of the 200 or so Limited Partners, entitled *Beardsley Holdings,*

---

**5.** The acknowledgement provides as follows:

We acknowledge receipt of the notice of assignment to which this acknowledgement is attached ("Notice") and agree to bound by the terms thereof. In particular and without limitation, ... (ii) ... we waive all rights of set-off and counterclaim and defense which we may have in relation to the Partnership Security Agreement, and/or the Wraparound Note (except as hereinafter provided); (iii) we shall seek no waiver, release, or variation (other than as permitted under such notice) of the Wraparound Note and/or the Partnership Security Agreement without your written consent; ...

We confirm that the Wraparound Note and the Partnership Security Agreement constitute valid and binding obligations of the undersigned and are in full force and effect and that there have been no amendments thereto or defaults thereunder and that those instruments constitute the entire agreement between the undersigned (except for a "Sales Agreement" bearing even date herewith) and the Assignor and that we are not aware of any prior assignment of the Wraparound Note and/or the Partnership Security Agreement and to our knowledge same are free of all liens, claims and encumbrances.

Acknowledgement, Def.App. Vol. I, Ex. "10".

**6.** According to the Memorandum Decision:

[t]he primary issue on this appeal is whether the appellants' contention that the plant material provision was induced by a fraudulent misrepresentation that such materials had been already sold to others for future delivery precludes summary judgment.

Def.App. Vol. II, Ex. "28," at 3.

**7.** The minutes of the first meeting of WGN's incorporators contains the following list of shareholders: Beardsley Holdings, Inc.; Western United Nurseries, Inc.; Phoenix Sunbelt Nurseries, Inc.; Phoenix Sunbelt Nurseries, II Ltd.; Phoenix Sunbelt Nurseries, III Ltd.; Great Western Nurseries, Ltd.; Arizona United Nurseries, Ltd.; White Tank Nurseries, Ltd.; Joseph A. Tyler; Diversified Agronomics, Ltd.; and/or their assignees or nominees. *See* Pl.App. Exhibit "10".

*Inc., et al. v. Arizona World Nurseries Limited Partnership, et al.,* Index No. C610527 (the "Second Arizona Action"), seeking to recover on the Wraparound Note.

On December 2, 1986, the Foreclosure Sale went forward. WUN purchased the Nursery Assets for $2,000,000 and newly formed WGN purchased the Wraparound Note for $677,000.

On December 4, 1986, WGN commenced an action against Arizona World, Minars, Hauser and each of the 200 or so Limited Partners seeking to recover upon the Wraparound Note (the "Third Arizona Action"). The complaint in the Third Arizona Action was virtually identical to that in the Second Arizona Action. On February 17, 1987, the Second Arizona Action was voluntarily dismissed without prejudice. By judgment dated December 30, 1987, the Superior Court dismissed the Third Arizona Action as to Hauser and the other limited partners, except those associated with World,[8] for lack of personal jurisdiction.

During the pendency of the instant action, on July 24, 1989, WGN was granted summary judgment in the Third Arizona Action against Arizona World, accelerating the entire principal balance due under the Wraparound Note, together with accrued interest, totalling $39,252,469.00 as of July 1, 1989. Arizona World appealed the July 24, 1989 judgment, and by order dated December 14, 1989, the appeal was dismissed.

By stipulation and order dated November 20, 1989, the Superior Court in the Third Arizona Action, *inter alia,* ordered dismissed without prejudice "[WGN's claims against Herman Finesod, James Haber and Harvey Minars for their pro-rata liability on the [Wraparound] Note as limited partners (Finesod and Haber) and stated gener-

al partner (Minars) ...," and dismissed with prejudice, "[c]ounterclaimant Arizona World's claims against [WGN]...." Def. App. Vol. IV, Ex. 48.[9]

*The Instant Action*

On December 18, 1986, plaintiffs commenced this action alleging claims based upon 42 U.S.C. § 1983 and interference with contractual relations, and seeking a declaratory judgment exonerating them from liability under the Wraparound Note. Plaintiffs sought both injunctive relief and damages under Section 1983. By Memorandum Opinion and Order dated October 26, 1987, the Court dismissed the Complaint's civil rights claims (the First through Fourth, and Seventh causes of action) insofar as those claims sought injunctive relief. The Court declined to dismiss the Fifth and Sixth causes of action based on tortious interference with contractual and business relations, and the Eighth cause of action seeking a declaratory judgment that the Limited Partners have no personal liability under the Wraparound Note. Plaintiffs later served an amended complaint alleging two causes of action, the first seeking a declaratory judgment under the Wraparound Note and the second based upon tortious interference with contractual and business relations. Defendants interposed an answer to the amended complaint denying its material allegations and raising various affirmative defenses.

Plaintiffs now move, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order granting them partial summary judgment on their declaratory judgment claim. Defendants cross-move for an order granting them summary judgment dismissing the amended complaint on the ground that it fails to state a claim upon which relief may be granted,[10] and seek leave to

---

8. These individuals included Herman Finesod, James Haber and Harvey Minars. *See* Def.App. Vol. IV, Ex. "48".

9. Though examination of the Stipulation and Order of Dismissal in the Third Arizona Action does not indicate that defendant/counterclaimant Minars' claims were ordered dismissed with prejudice or otherwise, the Stipulation does recite "Counterclaimants dismiss with prejudice all of their claims against Counterdefendant."

Absent from the record, however, is any indication of the nature of Minars' counterclaims.

10. Defendants' Notice of Motion indicates that defendants also move upon the ground that the Court lacks subject matter jurisdiction over plaintiffs' claims. Defendants, however, do not raise any basis for dismissal upon this ground in any of their submissions to the Court. Since there appears to be diversity jurisdiction under

serve an amended answer with counter-claim.

## DISCUSSION

### A. Defendants' Rights to Enforce the Wraparound Note

The issue presented by plaintiffs' declaratory judgment claim is whether WGN may enforce the Wraparound Note against the Limited Partners to the extent of each Limited Partner's pro-rata liability under the Wraparound Note. Resolution of this issue requires the Court to interpret the operative language of the Security Agreement and to determine whether to give effect to that language. Plaintiffs contend that the provision of the Security Agreement precluding the Limited Partners' personal liability is clear, unambiguous and fully enforceable, entitling them to summary judgment as a matter of law. They argue that because Western United bargained for, and accepted from World, a non-recourse obligation[11] embodied in the Non–Recourse Note, Western United and its successors and assigns may proceed only against the Collateral. They also argue that since the Security Agreement did not grant, and in fact specifically excluded any right to proceed against the Limited Partners, neither WUN nor WGN acquired such a right and may not now proceed against the Limited Partners for their pro-rata share of liability under the Wraparound Note. The Court addresses these contentions below.

### 1. Summary Judgment Standard

■ Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c). In testing whether the movant has met this burden, the Court must resolve all ambiguities against the movant. *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1187 (2d Cir.1987) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

■ The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on which that party would have the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).[12] The non-moving party then has the burden of coming forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Speculation, conclusory allegations and mere deni-

---

28 U.S.C. § 1332(a)(1), the Court will devote no further attention to this issue.

**11.** A non-recourse loan is "a type of security loan which bars the lender from action against the borrower if the security value falls below the amount required to repay the loan." *Black's Law Dictionary* 953 (5th ed. 1979). Under a typical non-recourse loan, "no recourse is available against the sponsor or any affiliate for liability top the lender in connection with breach or default, except to reach ... [the] collateral. Thus, the lender relies solely on the ... collateral in enforcing rights and obligations in connection with the ... loan." Hoffman, *A Practical Guide to Transactional Project Finance: Basic Concepts, Risk Identification, and Contrac-*

*tual Considerations,* 45 Bus.Law. 181, 185 (1989).

**12.** The moving party may rely on the evidence in the record to point out the absence of genuine issues of material fact. *Celotex, supra,* 477 U.S. at 323, 106 S.Ct. at 2553. The moving party does not have the burden of providing evidence to negate the non-moving party's claims. *Id.* As the Supreme Court recently noted, "whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.*

als are not enough to raise genuine issues of fact. To avoid summary judgment, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986) (interpreting the "genuineness" requirement).

■ Where the sole question presented on a motion for summary judgment is the interpretation of a clear and unambiguous written agreement, the issue is one of law for the court and may be decided upon a motion for summary judgment. *See Tokio Marine & Fire Ins. Co., Ltd. v. McDonnell Douglas Corp.*, 617 F.2d 936 (2d Cir. 1980); *West, Weir & Bartel, Inc. v. Mary Carter Paint Co.*, 25 N.Y.2d 535, 307 N.Y. S.2d 449, 255 N.E.2d 709 (1969); *Pharmaceutical Horizons, Inc. v. Sterling Drugs, Inc.*, 127 A.D.2d 514, 512 N.Y.S.2d 30 (1st Dept.1987).[13] Summary judgment is normally inappropriate when a contract term is ambiguous because a triable issue of fact usually exists as to its interpretation. *See Leberman v. John Blair & Co.*, 880 F.2d 1555 (2d Cir.1989); *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir.1985). Thus, if there is conflicting evidence regarding the parties' intent, the district Court may only identify the issues at the summary judgment stage, not resolve them. *See Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9–10 (2d Cir.1983). When the parties' intent is unclear, summary judgment may nevertheless be warranted when the parties do not present conflicting evidence of intent or when the movant presents evidence which is uncontradicted.

*See Burger King Corp. v. Horn & Hardart Co.*, 893 F.2d 525 (2d Cir.1990).

## 2. Construction of the Security Agreement

■ At the outset, the Court finds that the language of the Non–Recourse Note, not in dispute here, makes clear that World's obligation to WUN was non-recourse and was secured only by the Collateral set forth by the Security Agreement. The Non–Recourse Note provides that "[WUN] shall have no recourse to the Maker or its assets other than the Collateral specified in the Security Agreement and Payee, any holder of this Note or other transferee thereof shall look solely and only to the Collateral as security for the Note Obligations." Pl.App. Vol. II, Ex. "18," at 1. Nothing about this provision is equivocal. It clearly states the non-recourse nature of World's obligation and provides for the Security Agreement to govern the nature and extent of WUN's security interest in the Collateral. Accordingly, the Court turns its attention to the language of the Security Agreement to examine the nature and extent of the security interest it creates.

■ Review of the Security Agreement indicates that its language is clear and unambiguous. Paragraph "1", entitled "Security Interest," [14] plainly sets forth the items which constitute the Collateral. No less clear is the following limitation placed on enforcement of the Wraparound Note: "[WUN] shall not have the right to sue the Limited Partners or General Partners of Arizona World personally thereon other than to the extent of payments made to them by [Arizona World]." Security

---

**13.** The Purchase Agreement provides that:

> [t]his Agreement and the transactions contemplated herein have been consummated in the State of New York and shall be construed and enforced in accordance with and governed by the laws of such state, without regard to conflict of laws....

Purchase Agreement ¶ 27. The Security Agreement contains a similar choice of law clause:

> [t]his Security Agreement shall be governed by and interpreted under the laws of the State of New York applicable to contracts made and to be performed therein, without giving

effect to the principles thereof relating to the conflict of laws....

Security Agreement ¶ 7(g). Accordingly, New York law shall govern the interpretation and construction of both the Purchase Agreement (and transactions contemplated therein) and Security Agreement.

**14.** Paragraph 7(i) of the Security Agreement indicates that the "captions used herein are for reference purposes only and shall not effect the interpretation or meaning of the Security Agreement." In interpreting the Security Agreement the Court observes this directive.

Agreement, Pl.App. Vol. I Ex. "1(a)," at 3. This absolute and unconditional language plainly indicates that the parties intended to insulate the Limited Partners from personal liability under the Wraparound Note. The face of the Security Agreement indicates that the parties bargained for, and WUN specifically accepted, this significant limitation on its right to enforce the Wraparound Note against the Limited Partners. The Court is therefore bound to enforce the provision as written.[15] *See Hartford Acci. & Indem. Co. v. Wesolowski*, 33 N.Y.2d 169, 350 N.Y.S.2d 895, 305 N.E.2d 907 (1973). Because the parties' intent is clear from the face of the Security Agreement, the Court declines defendants' invitation to consider parol or other extrinsic evidence in interpreting its operative language.[16] *See National Bank of Northern New York v. Shaad*, 60 A.D.2d 774, 400 N.Y.S.2d 965 (4th Dept.1977); *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 161 N.Y.S.2d 90, 141 N.E.2d 590 (1957) (where contract is clear, circumstances extrinsic to the document may not be considered).

The Court rejects defendants' argument that the language of the Security Agreement purporting to preclude the Limited Partner's liability under the Wraparound Note should not be read to absolutely preclude the Limited Partners' personal liability but only to prevent a "first strike" against the Limited Partners by promising to proceed first against World or Arizona World. First, the plain meaning of the language at issue clearly and unambiguously refers not to a "first strike" as defendants suggest, but to an absolute and unconditional limitation on WUN's right to enforce the Wraparound Note against the Limited Partners, except to the extent of "payments made to them by [Arizona World]." If it had been the intent of these sophisticated parties merely to prevent a "first strike" against the Limited Partners, they would have seen fit to set forth such an agreement in language as clear as that which comprises the balance of the Security Agreement and which sets forth the "limited first strike" argument in defendants' briefs. They did not. Accordingly, the Court refuses to rewrite the parties' agreement. *See Wesolowski, supra*, 350 N.Y.S.2d at 897; *Bethlehem Steel Co., supra*, 161 N.Y.S.2d at 93.

■ Although the language of the Security Agreement plainly indicates an intent to limit the Limited Partners' liability under the Wraparound Note, it does not support plaintiffs' argument that the intended mechanism for insulating the Limited Partners from liability was to effect only a partial assignment of the Wraparound Note.[17] The Security Agreement, Purchase Agreement, Non-recourse Note, Assignment, Notice of Assignment and Acknowledgement (together, the "Operative Agreements") establish that rather than provide for a partial assignment of the Wraparound Note, the parties intended

---

15. Under the Uniform Commercial Code, "a security agreement is effective according to its terms between the parties, against purchasers of the collateral and against creditors." N.Y.U.C.C. § 9–201 (McKinney's 1990). The Official Comment to § 9–201 indicates that this section "states the general validity of a security agreement". *Id.*

16. The Court specifically declines to consider the deposition testimony of Eric C. Hauser (Def. App. Vol. II, Ex. "31"), Harvey Minars (Def.App. Vol. II, Ex. "32") or Barry Feldman, Esq. (Def. App. Vol. II, Ex. "33", Pl.App. Vol. II, Ex. "22"), to the extent that such testimony purports to illuminate the parties' intent in drafting the language of the Security Agreement at issue here. The Court similarly refuses to consider the position of the Internal Revenue Service on the Limited Partners' "at risk" status in interpreting the language of the Security Agreement.

17. Had the parties intended a partial assignment of the Wraparound Note the Court would be bound to enforce that agreement. Although the enforceability of partial assignments had at common law been subject to dispute, it is now well-settled that partial assignments of instruments are recognized and enforced where the principal obligor will not be subject to a multiplicity of actions, *see Blake v. Weiden*, 291 N.Y. 134, 51 N.E.2d 677 (1943); *see also Scarborough v. Berkshire Fine Spinning Assoc., Inc.*, 128 F.Supp. 948 (S.D.N.Y.1955), *aff'd*, 243 F.2d 575 (2d Cir.1957); *Hinkle Iron Co. v. Kohn*, 229 N.Y. 179, 128 N.E. 113 (1920), and where the assignor retains an identifiable and enforceable residuary interest in notes assigned to a third-party. *See Lipkowitz & Plaut v. Affrunti*, 95 Misc.2d 849, 407 N.Y.S.2d 1010 (N.Y.Sup.Ct.1978).

simply that the Wraparound Note not be enforceable against the Limited Partners. The Security Agreement grants the Wraparound Note in its entirety without any express or implied indication that any residuary interest should remain with World to be enforceable by it, and unequivocally indicates that the Wraparound Note was pledged to WUN in its entirety. Similarly, the Assignment itself grants WUN an undivided interest in the Wraparound Note.[18] There is thus no indication that the parties intended anything less than an assignment of the Wraparound Note in its entirety. Rather, based upon the clear language of the Security Agreement, the Court finds that the parties intended a discrete, independent contractual limitation on WUN's right to enforce the Wraparound Note.

### 3. Holder Status

■ Having determined that the Wraparound Note was pledged to WUN in its entirety, subject to the Security Agreement's limitation on its enforcement against the Limited Partners, the Court finds as a matter of law that WGN, having purchased the Wraparound Note at the foreclosure sale with knowledge of the limiting language of the Security Agreement, may not enforce the Wraparound Note against the Limited Partners "other than to the extent of payments made to them by [Arizona World]."

■ By purchasing the Wraparound Note at the foreclosure sale, WGN did not take the Wraparound Note as a holder in due course and thus did not take the Wraparound Note free of the WUN's limitation on enforcing the Wraparound Note against the Limited Partners. Under New York's Uniform Commercial Code, a holder in due course must first be a holder. Under U.C.C. § 1–201(20) a holder is defined as "a

person who is in possession of an ... instrument ... drawn, issued or indorsed to him or to his order or to bearer or in blank." U.C.C. § 3–202(1) states, in relevant part, that "negotiation is the transfer of an instrument in such form that the transferee becomes a holder. If the instrument is payable to order, it is negotiated by delivery with any necessary endorsement...." The next subsection, U.C.C. § 3–202(2), requires that an endorsement "be written by or on behalf of the holder and on the instrument or on a paper so firmly affixed thereto so as to become a part thereof." Indeed, under U.C.C. § 3–201(3), "negotiation takes effect only when the indorsement is made and until that time there is no presumption that the transferee is the owner." Thus, although a party may be a transferee of an instrument, it does not follow that such party must also be a holder within the meaning of U.C.C. Article 3. *See Consolidated Capital Corp. v. DeSalvo*, 146 Misc.2d 437, 550 N.Y.S.2d 803 (N.Y.Civ.Ct.1990). If a party is not a holder, it cannot be a holder in due course since U.C.C. § 3–302(1) defines "a holder in due course" as a *"holder who takes the instrument...."*

■ The Court finds that because the Wraparound Note is issued to the order of WUN, is neither drawn nor issued to WGN or its order, and is neither drawn nor issued in blank, WGN is not a holder. *See National Bank of North America v. Flushing National Bank*, 72 A.D.2d 538, 421 N.Y.S.2d 65 (1st Dept.1979). Assuming, *arguendo*, however, that WGN is a holder, it is not a holder in due course and does not have the benefit of U.C.C. § 3–305,[19] permitting a holder to take an instrument free of the claims or defenses

---

**18.** The Assignment provides in pertinent part:
 For good and valuable consideration and in order to secure the payment and performance by Assignor of its obligations under [the Operative Agreements], [World] does hereby sell, assign, and transfer ... to [WUN] ... all [World's] right, title, and interest in and to (but none of its obligations under) [the Partnership Security Agreement and the Wraparound Note] (emphasis added).

Def.App. Vol. I Ex. "8".

**19.** Section 3–305 provides "[t]o the extent that a holder is a holder in due course he takes the instrument free from (1) all claims to it on the part of any person; and (2) all defenses of any party to the instrument with whom the holder has not dealt ..." N.Y.U.C.C. § 3–305 (McKinney's 1964).

of the maker. U.C.C. § 3–302 provides, in pertinent part:

> (1) A holder in due course is a holder who takes the instrument (a) for value; and (b) in good faith; and (c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person ... (3) A holder does not become a holder in due course of an instrument (a) by purchase of it at judicial sale or by taking it under legal process.... (4) A purchaser of a limited interest can be a holder in due course only to the extent of the interest purchased.

Under subsection (3), therefore, WGN could not obtain holder in due course status by purchasing the Wraparound Note at the foreclosure sale even had it been a holder.

■ An equally significant impediment to WGN's holder in due course status is WGN's "notice," under U.C.C. § 3–302(1)(c), of the Security Agreement's express limitation on WUN's right to enforce the Wraparound Note against the Limited Partners. Under New York law, notice sufficient to preclude holder in due course status means "actual, subjective knowledge of defenses." *Indyk v. Habib Bank Ltd.*, 694 F.2d 54, 57 (2d Cir.1982) (citing *Chemical Bank v. Haskell*, 51 N.Y.2d 85, 92–93, 432 N.Y.S.2d 478, 411 N.E.2d 1339 (1980)). However, an individual who signs or accepts a written agreement, in the absence of fraud or other wrongful acts on the part of the other contracting party, is conclusively presumed to know its contents. *See Level Export Corp. v. Wolz, Aiken & Co.*, 305 N.Y. 82, 111 N.E.2d 218 (1953); *Metzger v. Aetna Ins. Co.*, 227 N.Y. 411, 125 N.E. 814 (1920); *Imero Fiorentino Assoc., Inc. v. Green*, 85 A.D.2d 419, 447 N.Y.S.2d 942 (1st Dept. 1982).

Applying these principles, the Court finds that both WUN and WGN are properly charged with actual knowledge of the contents of the Security Agreement.[20] Joseph Tyler, WUN's president, subscribed both the Security Agreement and Supplemental Agreement on WUN's behalf. Tyler was also responsible for incorporating WGN immediately prior to the foreclosure sale. At the time of incorporation and immediately thereafter, Tyler served as one of WGN's directors and as its president. *See* Articles of Incorporation and Bylaws of Western Group Nurseries, Inc., Pl.App. Ex. "9". Neither Tyler, WUN nor WGN has contested knowledge of the Security Agreement's terms. The Court therefore finds no genuine issue concerning WGN's actual knowledge of the terms of the Security Agreement, and concludes that WGN is properly charged with "notice," under U.C.C. § 3–302(1)(c), of the Security Agreement's limitation on WUN's right to enforce the Wraparound Note against the Limited Partners. WGN's notice of the limitation establishes knowledge of a defense to enforcement of the Wraparound Note. WGN is therefore entitled neither to holder in due course status under U.C.C. § 3–302, nor to the benefits available to a holder in due course under U.C.C. § 3–305. Since WGN is not a holder, much less a holder in due course, it is bound by the Security Agreement's limitation on the Limited Partner's liability under the Wraparound Note.

### 4. WGN's Defenses

Defendants raise a host of arguments urging that it not be bound by the language of the Security Agreement. The Court treats the most significant of these below.

#### a. *Waiver of Defenses*

■ The Court rejects defendants' argument that Minars' execution of the Acknowledgement on Arizona World's behalf unequivocally waived the Limited Partners'

---

**20.** Although the Court does not look to the Supplemental Agreement for assistance in interpreting the Security Agreement, the Supplemental Agreement illuminates the central role of the Limited Partners' limited liability under the Wraparound Note to the overall transaction. Indeed, the limitation on the Limited Partners' liability under the Wraparound Note was so pivotal to the transaction that World expressly made the entire asset purchase transaction contingent upon WUN's acceptance of the limitation as embodied preliminarily in the Supplemental Agreement. *See* Pl.App. Exhibit "6".

rights of set-off, defense or counterclaim against enforcement of the Wraparound Note. This argument misapprehends the effect of the Acknowledgement as well as the nature of WGN's interest in the Wraparound Note.

The plain language of the Acknowledgement (as well as the Assignment) refers not to the Limited Partners but to Arizona World. Indeed, it is subscribed as follows: "Arizona World Nurseries Limited Partnership—By Harvey Minars, General Partner." The document itself, therefore, though patently referring to a waiver of defenses to the Partnership Security Agreement and Wraparound Note, refers not to the Limited Partners but to Arizona World. The Court therefore rejects defendants' argument that the Acknowledgement waives the rights of the Limited Partners to contest liability under Wraparound Note by way of set-off, defense or counterclaim.

### b. *The Assignment Supersedes the Security Agreement*

■ Even if the Assignment and Acknowledgement are read to refer to the Limited Partners, the Court rejects any interpretation of these instruments which would render the language of the Security Agreement meaningless. It is a cardinal rule of contractual interpretation that a court shall not interpret an agreement in a way which leaves a part meaningless or ineffectual. *See Two Guys From Harrison–N.Y., Inc. v. S.F.R. Realty Assoc.,* 63 N.Y.2d 396, 482 N.Y.S.2d 465, 472 N.E.2d 315 (1984); *Corhill Corp. v. S.D. Plants, Inc.,* 9 N.Y.2d 595, 217 N.Y.S.2d 1, 176 N.E.2d 37 (1961). Where two seemingly conflicting provisions can be reconciled, a court should do so in order to give both effect. *See Proyecfin De Venezuela, S.A. v. Banco Industrial de Venezuela, S.A.,* 760 F.2d 390 (2d Cir.1985). This rule applies with equal force where two documents are contemporaneous and related or where one incorporates the terms of the other. *Id.* at 395–96.

■ The Operative Agreements (including, but not limited to, the Assignment, Acknowledgement, Security Agreement and Purchase Agreement), though entered into at different times during the latter portion of December 1984,[21] were executed and delivered pursuant to the terms of the Purchase Agreement as part of the same transaction. In the event of a conflict among the Operative Agreements, the terms of the Security Agreement were to govern.[22] Interpreting the Assignment and Acknowledgement so as to void the limitation on WUN's right to enforce the Wraparound Note as against the Limited Partners would leave that language meaningless and ineffectual. The Court rejects such a construction.

Enforcing the language of the Security Agreement as written, however, does not render the Limited Partners' liability under the Wraparound Note a nullity. Although WGN may not enforce the Wraparound Note against the Limited Partners for their pro-rata shares of liability under the Wraparound Note, the Limited Partners may nevertheless be liable to WGN pursuant to the terms of the Wraparound Note to the "extent of any payments made to them by

---

**21.** The Operative Agreements were signed and delivered between December 17 and December 31, 1984.

**22.** The Security Agreement provides in relevant part:

All agreements, instruments, documents, exhibits, or schedules referred to herein or annexed hereto are incorporated herein by reference. In the event of any conflict between any of same and this Agreement, this Agreement shall prevail....

Security Agreement ¶ 7(r). Although the Security Agreement does not refer to the Assignment or Acknowledgement by name, the Security Agreement does contemplate these agreements and incorporate them by reference. Paragraph 2(c) of the Security Agreement provides in relevant part:

The Debtor will procure the express written acknowledgement by and consent of the Partnerships to the assignment by Debtor to Secured Party of the Wraparound Note and Debtor's rights (but not its obligations) under the Partnership Security Agreement ... and the Partnership's agreement to the foregoing....

Security Agreement ¶ 2(c).

[Arizona World]." [23] This conditional language, read in conjunction with the immediately preceding limiting language of that sentence, reveals the logic and purpose of limiting the Limited Partners' liability to payments made by Arizona World to the Limited Partners. The provision serves to safeguard WGN against Arizona World's liquidation of the Nursery Assets (and consequent impairment of WUN's most significant item of collateral) and distribution of proceeds from such a liquidation to the Limited Partners. In effect, the provision permits WGN to trace the proceeds of any such liquidation to the Limited Partners. Such limited recourse to the Limited Partners was critical to protecting WGN's security interest in the Nursery Assets in view of World's non-recourse obligation to WUN under the Non–Recourse Note and the central position of the Nursery Assets to the collateralization of World's non-recourse obligation.

#### c. *Arizona World's "At Risk" provisions*

■■■ Defendants also argue that since the Limited Partners acknowledge that they were "at risk" to World under the Wraparound Note for purposes of obtaining substantial tax benefits, they cannot now claim that they are liable under the Wraparound Note for tax purposes but insulated from liability to the present owner of the Wraparound Note. Defendants properly point out the logical and, perhaps, legal inconsistency of plaintiffs' position that the Limited Partners are "at risk" on the Wraparound Note for tax purposes, and not "at risk" with respect to actual liability on the Wraparound Note. However, whether plaintiffs may incur liabilities with the Internal Revenue Service or in any other respect, arising from the failure of Arizona World's tax shelter strategy to lawfully realize anticipated tax benefits, is neither an issue to be determined by this Court in the present action nor a circumstance which defendants have standing to assert here insofar as it bears on the enforceability of the plain language of the Security Agreement. At issue here is not whether the Limited Partners properly claimed certain tax deductions in connection with their purchase of interests in Arizona World; rather, the issue is what rights in the Collateral and to enforce the Wraparound Note did WUN bargain for and receive in connection with the sale of the Nursery Assets.

#### d. *No incorporation of the Security Agreement*

The defendants also challenge the incorporation by reference of the Security Agreement's limitation on enforcement of the Wraparound Note. According to defendants, U.C.C. § 3–119, which permits modification of a negotiable instrument by a separate agreement, does not permit the Security Agreement to modify the Wraparound Note. Defendants argue that the section is inapplicable for the following reasons: (1) the Wraparound Note was not executed as part of the same transaction as the Security Agreement; (2) U.C.C. Official Comment No. 2 states that "other parties, such as an accommodation endorser, are not affected by the separate writing unless they were also parties to it as part of the transaction by which they became bound on the instrument"; and (3) the Wraparound Note makes no reference to the Security Agreement. The Court disagrees.

■■■ Under New York law, writings executed as part of the same transaction are to be read together as part of the same agreement. *See Rudman v. Cowles Communications,* 30 N.Y.2d 1, 330 N.Y.S.2d 33, 280 N.E.2d 867 (1972); *Williams v. Mobil Oil Corp.,* 83 A.D.2d 434, 445 N.Y. S.2d 172 (2d Dept.1981). U.C.C. § 3–119 makes this general rule applicable to negotiable instruments and provides, in relevant part:

---

**23.** Although this language is perhaps ambiguous with respect to what sort of payments constitute "payments ... by the partnership," the Supplemental Agreement makes plain that "payments" refers to "cash distributions made to [the Limited Partners] which are not made from Cash Flow (as defined in the Purchase Agreement) from sales of nursery stock and other plant materials in the ordinary course of business or from payments received on sale made pursuant to Section 15 of the Purchase Agreement." Supplemental Agreement, Pl.App. Vol. I, Ex. "1(c)".

As between the obligor and his immediate obligee or any transferee the terms of an instrument may be modified or affected by any other written agreement executed as part of the same transaction, except that a holder in due course is not affected by any limitation of his rights arising out of the separate written agreement if he had no notice of the limitation when he took the instrument.

\* \* \* \* \* \*

N.Y.U.C.C. § 3–119 (McKinney's 1964). The official commentary to this section provides in part:

This section is limited to the effect of a separate written agreement executed as a part of the same transaction. The separate writing is most commonly an agreement creating or providing for a security interest such as a ... chattel mortgage ... or pledge. It may, however, be any type of contract, including an agreement that upon certain conditions the instrument shall not be discharged or is not to be paid, or even an agreement that it is a sham and not to be enforced at all.

*Id.* Although defendants contend that the Wraparound Note was not executed as part of the "same transaction" in which the Security Agreement was executed and delivered, the undisputed facts suggest otherwise. The Operative Agreements do in fact reflect two distinct purchases and sales of the Nursery Assets. They also reflect, however, by way of numerous references and cross-references to the various agreements comprising the World/Arizona World transaction, that the two transactions were inextricably linked as components of an overall transaction, the contours and terms of which were known to WUN. For example, among the numerous references to the World/Arizona World transaction, the Purchase Agreement itself expressly recites:

The Sellers have been advised that the Purchaser intends to resell the Properties to Arizona World Nurseries Limited Partnership, an Arizona Limited Partnership ... but such resale shall not be a condition hereof. The purchaser intends

that the purchase and sale of the Properties shall take place simultaneously with the resale of the Properties to the Partnership.

Purchase Agreement, Def.App. Ex. "6" at Preamble. Moreover, the transactions in fact did close virtually simultaneously, and material consideration for the World/Arizona World transaction, e.g., the Wraparound Note and Partnership Security Agreement, served to collateralize the initial sale of the Nursery Assets by WUN to World, and is repeatedly referred to in the Security Agreement itself. As a matter of law, these factors warrant treating the two separate segments of the transaction as components of the same transaction for purposes of U.C.C. § 3–119.

### e. *Security Agreement Unenforceable by Limited Partners*

 Defendants' argument that the Security Agreement does not protect the Limited Partners since the Limited Partners were not party to the Security Agreement similarly fails. The operative language of the Security Agreement makes plain that the Limited Partners were the direct and, indeed, only intended beneficiaries of the Security Agreement's limitation on enforcement of the Wraparound Note against them. As intended third-party beneficiaries of the Security Agreement, the Limited Partners may properly seek to enforce the provisions insulating them from liability. *See Port Chester Elec. Const. Corp. v. Atlas*, 40 N.Y.2d 652, 389 N.Y.S.2d 327, 357 N.E.2d 983 (1976). The Limited Partners need not establish knowledge of terms of the Security Agreement at the time the Security Agreement was executed as their assent and acceptance will be presumed. *See Hudlak v. Hornell Indus., Inc.*, 304 N.Y. 207, 106 N.E.2d 609 (1950); *Gulla v. Barton*, 164 A.D. 293, 149 N.Y.S. 952 (1914); *Lawrence v. Fox*, 20 N.Y. 268 (1859).

### f. *Judgment creditor status*

 Defendants also claim that since WGN has now obtained a judgment against Arizona World accelerating the Wraparound Note, the Limited Partners' asserted

"at risk" obligation to World is now due and owing as the Limited Partners are creditors of under the Wraparound Note and Partnership Security Agreement. According to defendants:

> Since WGN has been assigned all the rights of [WUN], WGN may now pursue the plaintiffs in World's name by virtue of the power of attorney provisions in the Partnership Security Agreement and Assignment, or alternatively, in its capacity as judgment creditor of World, it may garnish the debt of plaintiffs to World.

Defendants' Supplemental Memorandum in Support of Their Cross–Motion for Summary Judgment, at 6. This argument is premised upon the erroneous assumptions that (a) the Limited Partners are protected only from a "first strike" by WUN or its successors and are ultimately liable for their pro-rata share of the Wraparound Note and (b) WGN's purchase of the Wraparound Note extinguished the Security Agreement's limitation against enforcing the Wraparound Note against the Limited Partners. In view of the Court's rejection of defendants' "first strike" theory of the operative language of the Security Agreement, WGN's judgment accelerating the Wraparound Note against World is irrelevant in determining the Limited Partners' liability under the Wraparound Note. Since the Security Agreement's unconditional limitation against enforcing the Wraparound Note against the Limited Partners is chargeable to WGN, WGN may not circumvent that limitation by arguing that it may now enforce the Wraparound Note "in World's name." It was precisely such a scenario that the limiting language of the Security Agreement serves to prevent.

#### g. *Collateral estoppel*

The Court rejects defendants' claim that plaintiffs are collaterally estopped from litigating the extent of WGN's rights to enforce the Wraparound Note against the Limited Partners. The error in defendants' argument stems from their misapprehension of the issues decided by the Arizona courts and the issues now before this Court.

Under the New York law of *res judicata*, a prior judgment is conclusive upon the parties in any subsequent action based upon the same transaction not only as to those issues which were actually litigated but also as to any issues which might have been, but were not, litigated in the earlier action. *See O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 445 N.Y.S.2d 687, 429 N.E.2d 1158 (1981). Under this "transactional analysis," once a claim is finally resolved, all other claims arising out of the same transaction or "factual grouping" constituting the transaction, are barred even if based upon different theories, or if seeking a different remedy. *Reilly v. Reid*, 45 N.Y.2d 24, 31, 407 N.Y.S.2d 645, 949, 379 N.E.2d 172, 176 (1978). Where two actions are not predicated on identical causes of action or arise from the same transaction, the doctrine of collateral estoppel nevertheless

> bars the relitigation of any issue which would be decisive in the later action and which was litigated and decided against the litigant in the earlier action, provided that the resolution of the issue in the earlier case must have been necessary to the judgment there and that the plaintiff must have had a "full and fair opportunity" in the earlier litigation to address the issue now claimed to be decisive in the later action.

*Winters v. Lavine*, 574 F.2d 46, 56 (2d Cir.1978) (citing *Schwartz v. Public Administrator*, 24 N.Y.2d 65, 71, 298 N.Y.S.2d 955, 960, 246 N.E.2d 725, 729 (1969)); *see Gilberg v. Barbieri*, 53 N.Y.2d 285, 441 N.Y.S.2d 49, 423 N.E.2d 807 (1981).

Here, defendants present no evidence of issue preclusion sufficient to estop Minars from litigating the extent of his personal liability under the Wraparound Note. Defendants are fundamentally mistaken in their assertion that "[t]he issue directly addressed by the Arizona Courts was the same as that which plaintiffs raise here, whether the foreclosure sale of World's interest in the [Wraparound] Note was proper." Defendants' Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Defendants' Motion for Summary Judgment, at

37. Although the propriety of the Foreclosure Sale may have been determined before the Arizona courts, that issue is not presently before this Court.[24] Rather, the issue before this Court is the enforceability of the Security Agreement's provision limiting the Limited Partners' liability under the Wraparound Note. Although Minars raised this issue before the Arizona Superior Court in connection with his motion to stay enforcement of the Judgment, *see* Def.App. Vol I, Ex. "18," there is no indication that the enforceability of the Wraparound Note against the Limited Partners was fully and fairly litigated or necessary to the outcome of that motion, or ever raised during the litigation of the merits of that action. More importantly, the Superior Court in the Third Arizona Action, having squarely before it only the enforceability of the Wraparound Note against its maker, Arizona World, and its assignor, World, had no reason to consider its enforceability against the Limited Partners. Finally, there is no indication that any Arizona court ever determined or even addressed the issue. Accordingly, the Court concludes that there is no collateral estoppel effect now barring Minars from litigating the enforceability of the Wraparound Note against him. *See Schwartz, supra,* 24 N.Y.2d at 71, 298 N.Y.S.2d at 960, 246 N.E.2d at 729.

The Court also rejects defendants' argument that Minars, on the basis of a Stipulation of Dismissal in the Third Arizona Action in which Minars dismissed his with prejudice his counterclaims in that action, is now estopped from maintaining this declaratory judgment action. Defendants' suggest that because Minars' counterclaims in the Third Arizona Action "specifi-cally rais[ed] the parenthetical language in the Partnership Note which is the subject of this action," Def.Supp.Mem. at 4, and were dismissed with prejudice, issues of fact exist with respect to the intent of the dismissal precluding summary judgment in favor of Minars.

Although defendants suggest that Minars' counterclaims in the Third Arizona Action raised identical issues to those raised here, the record contains no evidentiary material sufficient to raise a genuine issue of fact with respect to this element of their collateral estoppel defense. The Court is therefore unable to make even a threshold determination as to any purported identity between the counterclaims dismissed with prejudice in Arizona and Minars' declaratory judgment claim here, and makes no determination as to whether the Stipulation of Dismissal may be entitled to full faith and credit as a foreign judgment. *See* 28 U.S.C. § 1738.[25] Defendants' conclusory allegations of estoppel are insufficient to raise issues of fact precluding summary judgment. *See Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355–56; *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2509.

### B. *Payments to Plaintiffs*

The Court's decision to enforce the operative language of the Security Agreement as written leaves open the possibility that plaintiffs may nevertheless be liable to WGN "to the extent of payments made to them by [Arizona World]." With respect to Hauser, the record is uncontradicted that he received no distributions or payments of any kind from Arizona World. The Court therefore need go no further

---

**24.** Indeed, for the purposes of the instant motion and cross-motions, the Court assumes the propriety of the Execution Sale. *See* N.Y.U.C.C. § 9–507(2) (McKinney's 1990); *In re Zsa Zsa Ltd.,* 352 F.Supp. 665 (S.D.N.Y.1972), *aff'd,* 475 F.2d 1393 (2d Cir.1973); *Federal Deposit Ins. Corp. v. Forte,* 94 A.D.2d 59, 463 N.Y.S.2d 844 (2d Dept.1983).

**25.** 28 U.S.C. § 1738 provides in pertinent part:
The records and judicial proceedings of any court of any such State, Territory, or Possession, or copies thereof, shall be proved or admitted in other courts within the United States and its Territories and Possessions by the attestation of the clerk and seal of the court annexed, if a seal exists, together with a certificate of a judge of the court that the said attestation is in proper form.
Such Acts, record and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the Courts of such State, Territory, or Possession from which they are taken.

than the operative language of the Security Agreement in finding that Hauser is not subject to liability under the Wraparound Note.

■ The situation is more complex with respect to Minars. The record is uncontradicted that Minars, as Arizona World's general partner, received no cash or other distributions from Arizona World. Unlike Hauser, however, Minars received certain sums from Arizona World as compensation for his services as general partner.

■ With respect to Minars,[26] the Court finds the Security Agreement unclear as to whether the parties intended that "fees" to Minars for his services as general partner would constitute "payments ... by [Arizona World]," subject to recovery under the Wraparound Note. It is therefore appropriate to consider such extrinsic evidence as may be probative of the parties' intent. *See Schering, supra,* 712 F.2d at 9.

In interpreting the words "payments ... by [Arizona World]," the language of the Supplemental Agreement is instructive. It provides in relevant part:

the Security Agreement ... will be amended ... to make clear that upon occurrence of an event of default under the Security Agreement, [WUN] shall only have the right to proceed against the limited partners of [Arizona World] *for cash distributions made to them which are not made from Cash Flow (as defined in the Purchase Agreement) from sales of Nursery stock and other plant materials in the ordinary course of business or from payments received on sales made pursuant to Section 15 of the Purchase Agreement* (emphasis added).

Supplemental Agreement, Pl.App.Ex. "1(c)". Thus at least with respect to the Limited Partners, the parties intended the word "payments," as set forth in the Security Agreement, to refer to "cash distributions made to them which are not made from Cash flow ..." The resulting amendment (as embodied in the Security Agreement), however, refers both to the limited and general partners though the Supplemental Agreement is silent with respect to what constitutes "payments" to the general partners.

Here, although the Supplemental Agreement does not refer expressly to Arizona World's general partners as does the Security Agreement, the Supplemental Agreement is the only evidence of which "payments" WUN would be entitled to recover from any Arizona World partner. Significantly, defendants introduce no evidence that the underlying definition of "payments" as set forth by the Supplemental Agreement was not intended to apply to Arizona World's general as well as limited partners. Thus, although the Security Agreement's use of the term "payments" in connection with the term "General Partners" is unclear, the Supplemental Agreement is the only evidence which illuminates the question.

Application of the Supplemental Agreement's definition of "payments" to Minars comports with the overall architecture of the parties' agreement, is consistent with the parties intent with respect to the Limited Partners. There being no other evidence of the parties' intent, the Court interprets the Supplemental Agreement to apply both to the limited as well as general partners. Accordingly, the Court construes the term "payments" as applied to Minars to include only "cash distributions ... which are not made from Cash Flow (as defined in the Purchase Agreement) from sales of Nursery stock and other plant materials in the ordinary course of business or from payments received on sales made pursuant to Section 15 of the Purchase Agreement." Because there is no evidence that Minars received any such cash distributions, and in

---

**26.** The Court is mindful of the rule in this Circuit that in determining whether contract language is reasonably susceptible of more than one interpretation, the court makes this determination by reference to the contract alone. *See Burger King Corp. v. Horn & Hardart Co.,* 893 F.2d 525 (2d Cir.1990) (applying New York law). The Court does not depart from this rule here in determining application of the Security Agreement to Minars, Arizona World's general partner, since Paragraph "1" of the Security Agreement expressly refers both to Arizona World's "Limited Partners [and] General Partners."

**494**

light of Minars' sworn testimony that he received no such distributions, the Court finds no genuine issue concerning Minars' having received no such payments. He is therefore entitled to summary judgment upon the First Cause of Action.

### CONCLUSION

For the reasons set forth above, plaintiffs' motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on the complaint's First Cause of Action is granted in its entirety. Defendants' cross-motion for summary judgment dismissing the complaint is denied. Defendants' cross-motion, pursuant to Rules 13 and 15 of the Federal Rules of Civil Procedure, for leave to serve an amended answer with counterclaim is denied as moot. The Clerk is hereby directed to enter judgment accordingly.

SO ORDERED.