Hans W. **FLAGG** and Eileen S. **Flagg**, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

**YONKERS SAVINGS AND LOAN ASSOCIATION, FA (a/k/a Yonkers Financial), Defendant.**

No. 03 CIV. 5133(WCC).

United States District Court, S.D. New York.

March 8, 2004.

Wechsler Harwood LLP, (William R. Weinstein, Esq., Robert I. Harwood, Esq., Of Counsel), Rabunski & Katz, LLP (Michael Katz, Esq., Of Counsel), New York City, for Plaintiffs and the Putative Class.

Thacher Proffitt & Wood LLP (Jean E. Burke, Esq., Doreen Klein, Esq., Of Counsel), White Plains, NY, for Defendant.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiffs Hans W. Flagg and Eileen S. Flagg, on behalf of themselves and all others similarly situated, bring this action against defendant Yonkers Savings and Loan Association, a/k/a Yonkers Financial ("Yonkers"),[1] seeking declarations: (1) pursuant to 28 U.S.C. § 2201 that federal law neither preempts nor precludes the applicability of New York statutes requiring the payment of interest on escrow accounts; (2) pursuant to 28 U.S.C. § 2202 that defendant's actions in connection with the mortgages of plaintiffs and the putative class violated N.Y. GEN. OBLIG. LAW § 5–601; GEN. BUS. LAW § 349, BANKING LAW §§ 14–b and 6–k, REAL PROP. TAX LAW § 953(2) and constitute breach of contract and unjust enrichment; and (3) pursuant to 28 U.S.C. § 2202 that plaintiffs and the putative class are entitled to compensatory damages or disgorgement or restitution in an amount to be determined at trial.[2] In the alternative, should this Court hold that the federal regulations preempt the state statutes, plaintiffs seek a declaration that the federal regulations constitute a taking under the Fifth Amendment that entitles them to just compensation. Plaintiffs also seek certification of this case as a class action pursuant to FED. R. CIV. P. 23 with plaintiffs certified as class representatives.[3] Defendant has moved pursuant to FED. R. CIV. P. 12(b)(6) to dismiss the Complaint with prejudice for failure to state a claim on which relief can be granted. Plaintiffs have cross moved pursuant to FED. R. CIV. P. 56 and 23 for summary judgment and class certification. For the reasons set forth herein, we grant defendant's Rule 12(b)(6) motion to dismiss the Complaint with prejudice and deny as moot plaintiffs' Rule 56 cross motion for summary judgment.[4]

1. Defendant is a federal savings and loan association with its principal office in Yonkers, New York. (Complt.¶ 7.) It was acquired by Atlantic Bank of New York ("Atlantic Bank") in May 2002 as the result of a merger between Atlantic Bank and defendant's holding company parent, Yonkers Financial Corporation. (*Id.*)

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367 and 2201–02.

3. We reserve judgment on the class certification issue because we need reach it only if plaintiffs establish a basis for defendant's liability under either the New York statutes or the Fifth Amendment.

4. *See Westchester Day Sch. v. Vill. of Mamaro-*

## BACKGROUND

The facts underlying this dispute are simple and undisputed. Plaintiffs entered into a mortgage contract with defendant on June 12, 1998, in connection with a loan on their residence in Scarsdale, New York. (Pls. Rule 56.1 Stmt. ¶ 1; Complt. ¶ 6.) That contract included a provision governing funds held in escrow by defendant to pay for, inter alia, taxes, assessments and insurance, entitled "Lender's Obligations." (Pls. Rule 56.1 Stmt. ¶ 2.) This provision provides in relevant part:

Lender will not be required to pay me any interest or earnings on the funds unless either (i) Lender and I agree in writing, at the time I sign this Security Instrument, that Lender will pay interest on the Funds; or (ii) the law requires Lender to pay interest on the Funds.

With respect to the governing law, the mortgage agreement states:

*This Security Instrument is governed by federal law and the law that applies in the place where the Property is located.* If any term of this Security Instrument or of the Note conflicts with the law, all other terms of this Security Instrument and of the Note will remain in effect if they can be given effect without the conflicting term. This means that any terms of this Security Instrument and of the Note which conflict with the law can be separated from the remaining terms, and the remaining terms will still be enforced.

(Pls. Rule 56.1 Stmt. ¶ 3 (emphasis added).) Pursuant to this agreement, plaintiffs deposited more than $4,000 into the escrow account with defendant at the time that their loan closed, and the balance of that account sometimes exceeded $6,000 during the life of that loan. (*Id.* ¶ 4.) Defendant never paid plaintiffs interest on

that account before Yonkers merged with Atlantic Bank in May 2002. (*Id.* ¶ 5.) After the merger, Atlantic Bank began to pay plaintiffs interest on their escrow account. (*Id.* ¶ 6.)

## DISCUSSION

### I. *Standard of Review*

On a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), the court must accept as true all of the well pleaded facts and consider those facts in the light most favorable to the plaintiff. *See Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Hertz Corp. v. City of New York,* 1 F.3d 121, 125 (2d Cir.1993); *In re AES Corp. Sec. Litig.,* 825 F.Supp. 578, 583 (S.D.N.Y.1993) (Conner, J.). On such a motion, the issue is "whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds by Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). A complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Padavan v. United States,* 82 F.3d 23, 26 (2d Cir.1996) (quoting *Hughes v. Rowe,* 449 U.S. 5, 10, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980)). Generally, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." 2 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 12.34[1][b] (3d ed.1997); *see also Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1088 (2d Cir.1995). Allegations that are so conclusory that they fail to give notice of the basic events and circumstances of which the plaintiff complains, are insuffi-

*neck,* 236 F.Supp.2d 349, 351 (S.D.N.Y.2002) (Conner, J.) ("[P]laintiff's motion for partial

summary judgment is granted, thereby rendering moot defendants' motion to dismiss.").

cient as a matter of law. *See Martin v. N.Y. State Dep't of Mental Hygiene,* 588 F.2d 371, 372 (2d Cir.1978).

## II. *Whether the New York Escrow Account Interest Statutes are Preempted*

Defendant claims that regulations implemented by the Office of Thrift Supervision ("OTS") pursuant to the Home Owners Loan Act, 12 U.S.C. § 1464(a) (the "HOLA Regulations") preempt those New York state statutes that require the payment of interest on escrow funds because those regulations completely occupy the field of regulating federal savings associations and do not require interest payments in the absence of a written agreement to that effect. (Def. Mem. Supp. Mot. Dismiss at 4, 8.) Defendant also claims that the preemptive effect of these regulations is not vitiated by the Real Estate Settlement Procedures Act of 1974 ("RESPA"). (*Id.* at 10.) Plaintiffs contend otherwise. We begin our analysis with a review of the statutes and regulations at issue.

### A. *Review of the State and Federal Statutes and Regulations at Issue*

The HOLA Regulations are promulgated pursuant to 12 U.S.C. §§ 1463(a)[5] and 1464(a).[6] With respect to federal preemption as to the operation of federal savings associations, 12 C.F.R. § 545.2 provides generally:

The regulations in this Part 545 are promulgated pursuant to the plenary and exclusive authority of the Office to regulate all aspects of the operations of Federal savings associations, as set forth in section 5(a) of the Act. *This exercise of the Office's authority is preemptive of any state law purporting to address the subject of the operations of a Federal savings association.*

*Id.* (emphasis added). The HOLA Regulation governing preemption with respect to the lending and investment practices of federal savings associations is 12 C.F.R. § 560.2(a), which provides:

Pursuant to sections 4(a) and 5(a) of the HOLA, 12 U.S.C. 1463(a), 1464(a), OTS is authorized to promulgate regulations that preempt state laws affecting the operations of federal savings associations when deemed appropriate to facilitate the safe and sound operation of federal savings associations, to enable federal savings associations to conduct their operations in accordance with the best practices of thrift institutions in the United States, or to further other purposes of the HOLA. *To enhance safety and soundness and to enable federal savings associations to conduct their operations in accordance with best practices (by efficiently delivering low-cost credit to the public free from undue regulatory duplication and burden),*

---

5. 12 U.S.C. § 1463 governs the supervision of federal savings associations and provides in relevant part: "The Director [of the Office of Thrift Supervision] may issue such regulations as the Director determines to be appropriate to carry out the responsibilities of the Director or the Office." *Id.* § 1463(a)(2).

6. 12 U.S.C. § 1464(a) provides:

In order to provide thrift institutions for the deposit of funds and for the extension of credit for homes and other goods and services, the Director is authorized, under

such regulations as the Director may prescribe—

(1) to provide for the organization, incorporation, examination, operation, and regulation of associations to be known as Federal savings associations (including Federal savings banks), and

(2) to issue charters therefor, giving primary consideration of the best practices of thrift institutions in the United States. The lending and investment powers conferred by this section are intended to encourage such institutions to provide credit for housing safely and soundly.

*OTS hereby occupies the entire field of lending regulation for federal savings associations.* OTS intends to give federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation. *Accordingly, federal savings associations may extend credit as authorized under federal law, including this part, without regard to state laws purporting to regulate or otherwise affect their credit activities,* except to the extent provided in paragraph (c) of this section or § 560.110 of this part.[7] For purposes of this section, "state law" includes any state statute, regulation, ruling, order or judicial decision.

*Id.* (emphasis added). Section 560.2 also provides "illustrative examples" of "the types of state laws preempted by paragraph (a) of this section" and states that they *"include, without limitation,* state laws purporting to impose requirements regarding ... *Escrow accounts,* impound accounts, and similar accounts." *Id.* § 560.2(b)(6) (emphasis added). Section 560.2 then sets forth a list of state laws that are *not* preempted; this list does not mention escrow accounts or other laws relating to interest. *See id.* § 560.2(c).[8] This chapter does not contain a regulation specifically requiring the payment of interest by lenders on funds held in escrow accounts.

New York has, however, several state statutes governing mortgage lending institutions that do require the payment of interest on escrow accounts. N.Y. GEN. OBLIG. LAW § 5–601 provides in relevant part:

Any mortgage investing institution which maintains an escrow account pursuant to any agreement executed in connection with a mortgage on any one to six family residence occupied by the owner or on any property owned by a cooperative apartment corporation, ... located in this state shall, for each quarterly period in which such escrow account is established, credit the same with dividends or interest at a rate of not less than two per centum per year based on the average of the sums so paid for the average length of time on deposit or a rate prescribed by the banking board pursuant to section fourteen-b of the banking law and pursuant to the terms and conditions set forth in that section whichever is higher. The banking board shall prescribe by regulation the method or basis of computing any minimum rate of interest required by this section and any such minimum rate shall be a net rate over and above any service charge that may be imposed by any mortgage lending institution for maintaining an escrow account....

With respect to specific escrow accounts, N.Y. Real Prop. Tax Law § 953 prescribes the duties and responsibilities of mortgage

---

**7.** 12 C.F.R. § 560.110 is entitled "Most Favored Lender Usury Preemption" and is not relevant in the present case.

**8.** Specifically, 12 C.F.R. § 560.2(c) provides:
State laws of the following types are not preempted to the extent that they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a) of this section:
(1) Contract and commercial law;

(2) Real property law;
(3) Homestead laws specified in 12 U.S.C. 1462a(f);
(4) Tort law;
(5) Criminal law; and
(6) Any other law that OTS, upon review, finds:
(i) Furthers a vital state interest; and
(ii) Either has only an incidental effect on lending operations or is not otherwise contrary to the purposes expressed in paragraph (a) of this section.

investing institutions concerning real property tax escrow accounts and provides, inter alia, that:

> Every mortgage investing institution subject to the provisions of section fourteen-b of the banking law shall pay at least the minimum rate of interest on each real property tax escrow account as prescribed therein except that any such mortgage investing institution shall not be required to pay such minimum rate of interest on real property tax escrow accounts established for non-mortgagors.

*Id.* § 953(2). N.Y. Banking Law § 6–k(2)(b) governs the duties of mortgage investing institutions relating to real property insurance escrow accounts and provides that "[every mortgage investing institution shall pay at least the minimum rate of interest on each real property insurance escrow account as prescribed therein]." The interest rates to be paid under these state escrow provisions are set by the state banking board pursuant to procedures set forth in N.Y. Banking Law § 14–b.[9]

### B. *Preemption Analysis*

■■■■ "Within constitutional limits, federal preemption of state law is found where Congress has explicitly expressed its intent to preempt, or where the nature and object of the federal laws and regulatory scheme show Congress' intent to occupy the entire field." *Ingram Micro, Inc. v. Airoute Cargo Exp., Inc.*, 154 F.Supp.2d 834, 838 (S.D.N.Y.2001). The Second Circuit has described the Supremacy Clause origin of the preemption doctrines:

> The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land." U.S. CONST. art. VI, cl. 2. State law is preempted explicitly where Congress states an intent to occupy a field and to exclude state regulation. State law is preempted implicitly where the federal interest in the subject matter regulated is so pervasive that no room remains for state action, indicating an implicit intent to occupy the field, or where the state regulation at issue conflicts with federal law or stands as an obstacle to the accomplishment of its objectives.

*Rondout Elec., Inc. v. N.Y. State Dep't of Labor,* 335 F.3d 162, 166 (2d Cir.2003) (citing, inter alia, *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982)), *cert. denied,* —— U.S. ——, 124 S.Ct. 1045, 157 L.Ed.2d 889 (2004). Moreover, "[f]ederal law may preempt state regulation in whole or in part." *Id.*

■■■■ "Federal regulations have no less preemptive effect than federal statutes." *de la Cuesta,* 458 U.S. at 153, 102 S.Ct. 3014. When Congress "has directed an administrator to exercise his discretion, his judgments are subject to judicial review only to determine whether he has exceed-

---

9. Section 14–b also defines the term "mortgage investing institution" as utilized in that section and in N.Y. GEN. OBLIG. LAW § 5–601; the definition encompasses a variety of financial institutions, including "federal savings and loan association ... which makes, extends or holds a mortgage on any one to six family residence occupied by the owner or any property owned by a cooperative apartment corporation ... located in this state." *Id.* § 14–b(5). Section 14–b defines "escrow account" as "any account established pursuant to an agreement between a mortgagor and a mortgage investing institution whereby the mortgagor pays to the mortgage investing institution or his designee amounts to be used for the payment of insurance premiums, water rents or any similar charges, and shall also include real property tax escrow accounts as defined in title three-A of article nine of the real property tax law." *Id.* § 14–b(6).

ed his statutory authority or acted arbitrarily." *Id.* at 153–54, 102 S.Ct. 3014. This limited inquiry applies to regulations promulgated with the intention of preempting state law. *Id.* at 154, 102 S.Ct. 3014. Thus, if the administrator's " 'choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, [the courts] should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.' " *Id.* (quoting *United States v. Shimer*, 367 U.S. 374, 383, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1961)). Finally, a "pre-emptive regulation's force does not depend on express congressional authorization to displace state law; moreover, whether the administrator failed to exercise an option to promulgate regulations which did not disturb state law is not dispositive." *Id.*

In determining whether the HOLA Regulations preempt state law, we must consider "whether the regulations evidence a desire to occupy a field completely.... Pre-emption, [however], should not be inferred, however, simply because the agency's regulations are comprehensive." *R.J. Reynolds Tobacco Co. v. Durham County, N.C.*, 479 U.S. 130, 149, 107 S.Ct. 499, 93 L.Ed.2d 449 (1986) (citations omitted) (citing *de la Cuesta*, 458 U.S. at 153–54, 102 S.Ct. 3014, and *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 716–18, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985)) (noting that "the present statutes and regulations that guide this monitoring and the warehouse proprietor's own conduct with respect to the imported goods are not so comprehensive as to leave no room for North Carolina's assessment of ad valorem taxes" in concluding that Congress has not "exercised its power under the Supremacy Clause to pre-empt ad valorem state taxation of imported goods that are stored in customs-bonded warehouses and that are destined for domestic markets"). Moreover, "as long as a federal statute contains an express preemption clause, it is wholly unnecessary and inappropriate to import notions of implied preemption through conflict into the express preemption analysis." *Dow Agrosciences LLC v. Bates*, 332 F.3d 323, 329–30 (5th Cir.2003) (footnotes omitted) (discussing *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517, 531–32, 544, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (plurality opinion)), *petition for cert. filed*, (No. 03–388), 72 U.S.L.W. 3184 (U.S. Sept. 9, 2003). Thus, if the legislation includes a specific preemption provision, " 'the Court's task is one of statutory interpretation—only to identify the domain expressly preempted by the provision.' " *Dow Agrosciences*, 332 F.3d at 330 n. 12 (quoting *Cipollone*, 505 U.S. at 532, 112 S.Ct. 2608 (Blackmun, J., concurring in part and dissenting in part)).

Defendant, citing the preamble to the HOLA Regulations and several opinion letters authored by OTS's chief counsel, claims that the HOLA Regulations preempt the New York escrow statutes because they expressly occupy the entire field of lending by federal associations and leave the payment of interest on escrow accounts to be governed by the loan agreement. (Def. Mem. Supp. Mot. Dismiss at 4–6, 8.) In response, plaintiffs claim that the regulations, preamble and interpretive letters are unreasonable as applied and entitled to no deference because the HOLA Regulations could not occupy the entire field since they do not include a regulation governing the payment of interest in connection with escrow accounts and specifically defer to RESPA with respect to such accounts. (Pls. Mem. Supp. Summ. J. at 9–11, 16.) We conclude that the New York escrow account interest statutes are preempted because the HOLA

Regulations occupy the entire field of governing federal loan associations.

### 1. *The Preemptive Language of the Regulations*

Occupation of the entire field is primarily evinced by the plain text of the applicable regulations. For example, 12 C.F.R. § 560.2(a), the Regulation that governs federal preemption in the lending and investment practices of federal savings associations,[10] states explicitly that it *"occupies the entire field* of lending regulation for federal savings associations" and that such associations "may extend credit without regard to state laws purporting to regulate or otherwise affect their credit activities." *Id.* (emphasis added). Indeed, as stated previously, the express exemptions from preemption under this regulation are indisputably inapplicable in the present case. *See supra* notes 7–8. Most tellingly, state laws pertaining to escrow accounts are explicitly included as an "illustrative example" of state laws that are preempted by the OTS regulations. *Id.* § 560.2(b).

### 2. *The Preamble and the Regulatory History*

This evidence of OTS's preemptive intent is further reinforced by the preamble to 12 C.F.R. § 560.2, as published in the Federal Register. According to the preamble, § 560.2 was intended to "set[ ] forth OTS's longstanding position, as developed in case law and legal opinions by both OTS and its predecessor, the FHLBB,[11] and as reflected in § 545.2, on the federal preemption of state laws affecting the lending activities of federal savings associations." It was promulgated when OTS moved "its lending regulations out of Part 545 and, thus, separate[d] them from its general preemption regulation, § 545.2." OTS Final Rule, 61 Fed.Reg. 50,951, 50,965 (Sept. 30, 1996) (codified at 12 C.F.R. pts. 545, 556, 560, 563, 566, 571 and 590). Indeed, the new preemption regulation was expressly intended "to confirm and carry forward [OTS's] existing preemption position." *Id.*

Substantively, the HOLA Regulations are silent on the topic of the payment of interest on escrow accounts. This silence is by design; in 1983, the FHLBB promulgated regulations that "remove[d] the [existing] substantive provisions pertaining to escrow accounts, allowing such matters to be governed by the loan contract, and in their place require a more detailed disclosure about the accounts." Rules and Regulations of Federal Home Loan Bank Board, 48 Fed.Reg. 23,032, 23,039 (May 23, 1983) (codified at 12 C.F.R. pts. 523, 526, 541, 545, 555, 561 and 563). Among these deleted provisions was a section requiring the payment of interest on escrow accounts by lenders if the state wherein the security dwelling was located had a statute requiring such payments. *See First Fed. Sav. & Loan Ass'n v. Greenwald,* 591 F.2d 417, 420 n. 3 (1st Cir.1979) (describing previous regulation). That provision was deleted because the 1983 revision "only referenc[es] the requirements of RESPA" and allows lenders to "require escrow accounts to the extent agreed to in the loan contract," subject to new disclosure requirements as to the escrow account's purpose, computation of amount paid and the rights of the lender if the borrower fails to make escrow payments. Rules and Regulations of Federal Home Loan Bank Board, 48 Fed.Reg. at 23,039.

---

**10.** Section 560.2 is related to, but distinct from § 545.2, which is the regulation that governs preemption of state laws in the general operation of federal savings associations. *See supra* Part II.A.

**11.** FHLBB is the abbreviation for Federal Home Loan Bank Board.

### 3. *Agency Interpretations of the HOLA Regulations*

 Moreover, our conclusion is consistent with the position that OTS has taken with respect to the broad preemptive effect of the HOLA Regulations on other matters. Indeed, in 1991, OTS concluded that N.Y. REAL PROP. TAX LAW § 953, a statute at issue in this case, *see supra* Part II.A., was preempted by the more general preemption statement of 12 C.F.R. § 545.2 "insofar as it purports to regulate interest payments, service charges, and the disclosure of information on escrow accounts for mortgages between Federal savings associations and their borrowers." Opinion Letter by Chief Counsel Harris Weinstein, at 1 (Jan. 3, 1991). That letter noted the regulatory history of the 1983 revision, and concluded that "escrow accounts on mortgage loans are among the operations of federal savings associations that are governed *solely* by federal law." *Id.* at 3–4. Moreover, OTS has continued to endorse a construction that gives broad preemptive effect to the HOLA Regulations.[12] *See* Opinion Letter by Chief Counsel Carolyn J. Buck, at 17–18 (Mar. 10, 1999) (relying on 12 C.F.R. § 560.2 and examples cited therein to conclude that the HOLA Regulations preempt application of the broad provisions of the California Unfair Competition Act in a manner that would apply to federally chartered loan associations' advertising, forced placement of hazard insurance and charging of loan-related fees); Opinion Letter by Chief Counsel Carolyn J. Buck, at 1 (Dec. 24, 1996) (concluding with respect to credit card issuance by federally chartered savings association that "federal law does not preempt the cited Indiana law prohibiting fraudulent and deceptive loan practices" but does preempt Indiana statutes that "pertain to disclosure and loan-related charges" that are within the purview of § 560.2). "An agency's consistent interpretation of its regulations is to be given controlling weight unless plainly erroneous or inconsistent with the regulation." *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 780 (2d Cir.2002). Moreover, this deference extends to interpretive positions taken in opinion or policy letters issued by the agency. *See id.* at 780 n. 7. Given the preemptive language of 12 C.F.R. § 560.2 and the various examples discussed therein, OTS's construction of that language is neither inconsistent nor plainly erroneous, and thus is entitled to deference by this Court. Indeed, our conclusion is in accord with *Wis. League of Fin. Insts., Ltd. v. Galecki*, 707 F.Supp. 401 (W.D.Wis.1989), wherein the court concluded that a Wisconsin state statute requiring lenders, including federally chartered savings institutions, to pay interest on escrow accounts was preempted explicitly by the statement in 12 C.F.R. § 545.2 and implicitly by the structure and purpose of the federal regu-

**12.** Defendant has submitted an Opinion Letter by the Chief Counsel of OTS commenting directly on the present case and concluding that there is no obligation to pay interest because the HOLA Regulations preempt the New York escrow statutes, a result not changed by the choice of law provision in the mortgage. *See* Opinion Letter by Chief Counsel Carolyn J. Buck, at 5 (Oct. 6, 2003). This letter was drafted in response to a request by defendant's counsel for concurrence in a detailed analysis that was provided to OTS, along with a copy of the letter from plaintiffs' counsel to the Court advising us of the grounds, including RESPA, for their summary judgment motion. (Weinstein Decl., Exs. 9–10.) Although we are entitled to give deference even to those agency interpretations that arise directly out of the present litigation, *see, e.g., Barnhart v. Walton*, 535 U.S. 212, 221, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002), we decline to give weight to the letter in this case because it does not address the impact of RESPA on plaintiffs' contentions and thus fails to consider plaintiffs' principal argument against the federal preemption of the New York statutes. *See also infra* Part II.C.

lations, which was to create flexibility in the negotiation of escrow arrangements. *Id.* at 404–06. Accordingly, we disagree with plaintiffs' contention that OTS cannot occupy a field wherein it has not issued specific regulations (Pls. Mem. Supp. Summ. J. at 11) and we conclude that the New York escrow account interest statutes are preempted by the HOLA Regulations.

### C. Whether Preemption is Consistent with the HOLA and RESPA Statutes

Plaintiffs claim, however, that this preemptive effect is inconsistent with both HOLA and RESPA, to which OTS has deferred with respect to escrow accounts. (Pls. Mem. Supp. Summ. J. at 12–13.) We address each claim in turn.

### 1. Whether the HOLA Regulations are Consistent with HOLA

With respect to HOLA, plaintiffs cite 12 U.S.C. § 1464(n)(1), and claim that HOLA specifically subjects federal savings associations to state laws. Section 1464(n) governs federal savings associations acting as trustees or in other fiduciary capacities. In particular, § 1464(n)(1) describes the applicable permitting process:

> The Director may grant by special permit to a Federal savings association applying therefor the right to act as trustee, executor, administrator, guardian, or in any other fiduciary capacity in which State banks, trust companies, or other corporations which compete with

Federal savings associations are permitted to act under the laws of the State in which the Federal savings association is located. Subject to the regulations of the Director, service corporations may invest in State or federally chartered corporations which are located in the State in which the home office of the Federal savings association is located and which are engaged in trust activities.

Furthermore, plaintiffs cite *Jamaica Sav. Bank v. Lefkowitz*, 390 F.Supp. 1357 (E.D.N.Y.), *aff'd without opinion*, 423 U.S. 802, 96 S.Ct. 10, 46 L.Ed.2d 23 (1975), in support of the proposition that a "federal savings association is acting as a 'trustee . . . or in [another] fiduciary capacity' in connection with the escrow deposits of plaintiffs and the Class," and thus is subject to the same rights and conditions as state associations under § 1464(n)(1). (Pls. Mem. Supp. Summ. J. at 12–13.)

We conclude that § 1464(n)(1) does not subject federal savings associations to state laws with respect to the payment of interest on escrow accounts. We do not read the language of that subsection as imposing any specific substantive state law standards on the conduct of federal savings associations acting as fiduciaries. Our reading is further reinforced because § 1464(n) contains other subsections that *do* in fact affirmatively and expressly direct federal savings institutions to follow state laws with respect to deposits and oaths and affidavits, namely, § 1464(n)(5) [13] and § 1464(n)(6).[14] More-

---

13. Section 1464(n)(5) provides:
 Whenever the laws of a State require corporations acting in a fiduciary capacity to deposit securities with the State authorities for the protection of private or court trusts, Federal savings associations so acting shall be required to make similar deposits. Securities so deposited shall be held for the protection of private or court trusts, as provided by the State law. Federal savings associations in such cases shall not be required to execute the bond usually re-

quired of individuals if State corporations under similar circumstances are exempt from this requirement. Federal savings associations shall have power to execute such bond when so required by the laws of the State involved.

14. Section 1464(n)(6) provides:
 In any case in which the laws of a State require that a corporation acting as trustee, executor, administrator, or in any capacity specified in this section, shall take an oath

over, the section of *Jamaica Savings Bank* cited by plaintiffs is inapposite because it does not relate to a preemption issue; rather, it concluded that the New York escrow account interest statutes did not amount to an unconstitutional taking because the bank "did not obtain an ultimate beneficial interest in the funds for itself," but nevertheless realized profits from their investment that should be shared with mortgagors. 390 F.Supp. at 1363. Accordingly, we conclude that the HOLA Regulations are not inconsistent with the HOLA statute.

### 2. *Whether the HOLA Regulations are Consistent with RESPA*

■ We next turn to plaintiffs' claim that the HOLA Regulations are inconsistent with RESPA because regulations promulgated pursuant to that Act: (1) apply to post-closing obligations such as interest payments on escrow accounts; and (2) incorporate state escrow statutes that provide greater consumer protection, such as New York's escrow account interest laws. (Pls. Mem. Supp. Summ. J. at 4–9.) Defendant contends that RESPA does not blunt the preemptive effect of the HOLA Regulations because the payment of interest on escrow accounts is not a "settlement practice" under RESPA. (Def. Mem. Supp. Mot. Dismiss at 10.) Accordingly, we first address the purpose and scope of RESPA.

As stated in 12 U.S.C. § 2601, Congress enacted RESPA because:

(a) The Congress finds that significant reforms in the real estate settlement process are needed to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country. . . .

(b) It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result—

(1) in more effective advance disclosure to home buyers and sellers of settlement costs;

(2) in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services;

(3) in a reduction in the amounts home buyers are required to place in escrow accounts established to insure the payment of real estate taxes and insurance; and

(4) in significant reform and modernization of local recordkeeping of land title information.

With respect to escrow accounts, RESPA provides limitations on the amount that lenders can require borrowers or prospective borrowers to deposit into escrow accounts and requires loan servicers to provide borrowers with account statements and notifications of shortages. *See* 12 U.S.C. § 2609. This provision is, however, silent about the payment of interest. Finally, RESPA contains a savings provision describing its interaction with state laws governing real estate settlement practices, and expressly allowing state laws to provide consumer protections greater than those contained therein:

This chapter does not annul, alter, or affect, or exempt any person subject to the provisions of this chapter from complying with, the laws of any State with respect to settlement practices, except to the extent that those laws are inconsistent with any provision of this chapter, and then only to the extent of the

---

or make an affidavit, the president, vice president, cashier, or trust officer of such

association may take the necessary oath or execute the necessary affidavit.

inconsistency. The Secretary is authorized to determine whether such inconsistencies exist. *The Secretary may not determine that any State law is inconsistent with any provision of this chapter if the Secretary determines that such law gives greater protection to the consumer.* In making these determinations the Secretary shall consult with the appropriate Federal agencies.

12 U.S.C. § 2616 (emphasis added).

Accordingly, plaintiffs claim that the payment of interest on escrow accounts is a "settlement practice" under RESPA and therefore the Secretary may not preempt the New York law that gives greater protection to the consumer. "Settlement *practice*" is not a term defined in RESPA's definitions section, 12 U.S.C. § 2602. The definitions section does, however, define the term "settlement services" to include:

> any service provided in connection with a real estate settlement including, but not limited to, the following: title searches, title examinations, the provision of title certificates, title insurance, services rendered by an attorney, the preparation of documents, property surveys, the rendering of credit reports or appraisals, pest and fungus inspections, services rendered by a real estate agent or broker, the origination of a federally related mortgage loan (including, but not limited to, the taking of loan applications, loan processing, and the underwriting and funding of loans), and the handling of the processing, and closing or settlement.

12 U.S.C. § 2602(3). The First Circuit has concluded that the payment of interest on escrow accounts is not a "settlement practice" within the scope of RESPA and that its savings clause did not bar preemption of state laws [15] requiring such payments. *Greenwald*, 591 F.2d at 426. Although the First Circuit did not explicate its reasoning, the district court in that case engaged in a temporal analysis that concluded that "interest payment on tax escrow accounts, which can continue long after the closing of the mortgage transaction and which can continue to occur during the entire life of the mortgage, is obviously not a settlement practice within the meaning of the statute." *Greenwald v. First Fed. Sav. & Loan Ass'n*, 446 F.Supp. 620, 625 (D.Mass. 1978).

Plaintiffs claim that the *Greenwald* temporal analysis is both legally incorrect and, in any event, rendered obsolete by the 1990 enactment of 12 U.S.C. § 2605(g). (Pls. Mem. Supp. Summ. J. at 5–6.) They contend that § 2605(g), as well as § 2609(a)(2), which existed at the time of the *Greenwald* decision, evince Congress's desire to extend "settlement practices" with respect to escrow accounts past the initial closing. In response, defendant relies on the *Greenwald* analysis with respect to RESPA's applicability, but also claims that RESPA was a remedial statute intended to improve disclosure and prohibit abusive practices, not to impose on lenders new substantive obligations such as the payment of interest on escrow accounts. (Def. Mem. Supp. Mot. Dismiss at 11; Def. Reply Mem. Supp. Mot. Dismiss at 6.)

12 U.S.C. § 2605(g) provides:

> If the terms of any federally related mortgage loan require the borrower to make payments to the servicer of the

---

**15.** *Greenwald's* preemption ruling was the result of an actual conflict analysis that stemmed from the existence of a since-deleted HOLA regulation governing the payment of interest on escrow accounts, rather than the broader "occupying the field" conclusion utilized in this Opinion and Order. 591 F.2d at 425–26. The RESPA analysis is, however, equally applicable because, as is discussed *infra*, RESPA has no provision specifically concerning the payment of interest on escrow accounts.

loan for deposit into an escrow account for the purpose of assuring payment of taxes, insurance premiums, and other charges with respect to the property, *the servicer shall make payments from the escrow account for such taxes, insurance premiums, and other charges in a timely manner as such payments become due.*

Section 2609(a)(2) governs the amount that the lender may require that the borrower place into escrow. It provides:

A lender, in connection with a federally related mortgage loan, may not require the borrower or prospective borrower ... to deposit in any such escrow account in any month beginning with the first full installment payment under the mortgage a sum (for the purpose of assuring payment of taxes, insurance premiums and other charges with respect to the property) in excess of the sum of (A) one-twelfth of the total amount of the estimated taxes, insurance premiums and other charges which are reasonably anticipated to be paid on dates during the ensuing twelve months which dates are in accordance with the normal lending practice of the lender and local custom, provided that the selection of each such date constitutes prudent lending practice, plus (B) such amount as is necessary to maintain an additional balance in such escrow account not to exceed one-sixth of the estimated total amount of such taxes, insurance premiums and other charges to be paid on dates, as provided above, during the ensuing twelve-month period: *Provided, however,* That in the event the lender determines there will be or is a deficiency he shall not be prohibited from requiring additional monthly deposits in such escrow account to avoid or eliminate such deficiency.

12 U.S.C. § 2609(a)(2).

We begin by noting that, in a relatively recent opinion, the Ninth Circuit has approved *Greenwald's* temporal "at or before settlement" approach to the scope of RESPA's applicability in the context of whether a lender is required to disclose the possibility that demand and reconveyance fees will be assessed in the future. *See Bloom v. Martin,* 77 F.3d 318, 321 (9th Cir.1996). We, conclude, however, that the *Greenwald* temporal analysis lacks continuing viability in the context of escrow accounts because §§ 2605 and 2609 impose obligations on lenders that extend beyond the date of the closing. Indeed, an Illinois federal district court has noted that "RESPA applies not only to the actual settlement process, however, but also to the servicing of federally regulated mortgage loans." *MorEquity, Inc. v. Naeem,* 118 F.Supp.2d 885, 900 (N.D.Ill.2000). Nevertheless, we also conclude that the payment of interest on escrow accounts remains beyond the scope of RESPA, which therefore lends no support for plaintiffs' claim.

Congress enacted RESPA to require lenders to provide better information and disclosure to consumers, thereby protecting them from abusive practices such as, inter alia, unnecessarily high closing and escrow charges. *See* 12 U.S.C. § 2601; *MorEquity,* 118 F.Supp.2d at 900. Put differently, the scope of RESPA ends with the prevention of potentially abusive charges against consumers; it is intended to protect consumers' present capital.[16] Accordingly, a lender's obligation to pay

---

**16.** Plaintiffs argue that the payment of interest on escrow accounts does in fact impact the amount that borrowers are required to pay out-of-pocket into those accounts, and therefore, falls within the ambit of RESPA.

(Pls. Reply Mem. Supp. Summ. J. at 3.) In support of this contention, plaintiffs rely on the fact that most lenders who pay interest do so in the form of a direct credit to the borrowers' accounts. (*Id.*) Plaintiffs also rely on the

interest falls outside the scope of RESPA and into the deregulated ambit of the mortgage agreement's terms.[17] We, therefore, conclude that the HOLA Regulations are not inconsistent with RESPA and that they preempt the New York escrow account interest statutes.[18] Accordingly, we grant defendant's motion, deny plaintiffs' cross motion, and dismiss the First Cause of Action in the Complaint seeking a declaration that federal law does not preempt or preclude the applicability of the New York escrow account interest statutes. We also grant defendant's motion, deny plaintiffs' cross motion, and dismiss the Second, Third and Fifth Causes of Action, as they are based on the preempted state statutes.[19]

"economic impact" of such payments when they are made by separate check. (*Id.*) We disagree with plaintiffs' arguments because the mechanics of payment are irrelevant; acceptance of their "economic impact" argument conceivably would stretch RESPA to cover every collateral source of income that might affect the amount of out-of-pocket funds that a borrower would need to place into escrow—an interpretation that we decline to adopt.

17. Plaintiffs also argue that it is unreasonable for OTS to make the payment of interest on escrow accounts a matter of separate contractual agreement, rather than regulation because such mortgage agreements are contracts of adhesion offered to borrowers on a "take it or leave it" basis. (Pls. Mem. Supp. Summ. J. at 14–15.) Accepting plaintiffs' representation as true, we nevertheless decline to pass on the reasonableness of the HOLA Regulations because, inasmuch as they are not inconsistent with HOLA or RESPA and there is no claim that they are completely arbitrary, such an inquiry would be an inappropriate judicial intrusion into the administrative rule-making process. *See, e.g., de la Cuesta*, 458 U.S. at 169–70, 102 S.Ct. 3014, 73 L.Ed.2d 664 ("Admittedly, the wisdom of the Board's policy [not banning the use of due-on-sale clauses] is not uncontroverted. But neither is it arbitrary or capricious. As judges, it is neither our function, nor within our expertise, to evaluate the economic soundness of the Board's approach.").

18. Plaintiffs, citing the "savings" statute, 12 U.S.C. § 2616 and regulations 24 C.F.R. §§ 3500.17(c)(8) and (d)(1)(C), also claim that RESPA and the regulations promulgated thereunder specifically incorporate state escrow statutes that provide greater consumer protection. (Pls. Mem. Supp. Summ. J. at 8.) Although these regulations clearly incorporate state laws that provide greater consumer protections with respect to the existence of escrow accounts and the amount of money that borrowers must deposit therein, the payment of interest is beyond their scope because like the RESPA statutes, they concern only payments by consumers.

19. Plaintiffs contend that their Third Cause of Action, based on violations of N.Y. GEN. BUS. LAW § 349, the deceptive business practices statute, remains viable because defendant's failure to disclose the federal preclusion of the state escrow statutes constitutes failure to disclose a material fact. (Pls. Mem. Supp. Summ. J. at 23–24.) Defendant contends otherwise, and notes that compliance with applicable federal regulations is a compete defense to claims of deceptive business practices under § 349(d). (Def. Mem. Supp. Mot. Dismiss at 19 n. 4.)

Section 349(d) provides that:

In any such action it shall be a complete defense that the act or practice is, or if in interstate commerce would be, subject to and complies with the rules and regulations of, and the statutes administered by, the federal trade commission or any official department, division, commission or agency of the United States as such rules, regulations or statutes are interpreted by the federal trade commission or such department, division, commission or agency or the federal courts.

We conclude that plaintiffs' action under § 349 fails to state a claim for which relief can be granted because the federal regulations completely preempt the state escrow account interest statutes, and defendant is in compliance with the applicable federal requirements. Moreover, "[c]onsumer fraud claims may not be predicated upon fully disclosed facts," *Negrin v. Norwest Mortgage, Inc.*, 263 A.D.2d 39, 50, 700 N.Y.S.2d 184 (2d Dep't 1999), and "the parties are presumed to have contracted with knowledge of [the] law." *Alexander Muss & Sons v. Rozany*, 170 Misc.2d 890, 891, 655 N.Y.S.2d 238 (1996)

### III. Whether the Mortgage Agreement Requires the Payment of Escrow Interest

Defendant, relying on *de la Cuesta*, next contends that the mortgage agreement's interest and choice of law clauses did not require it to pay interest on escrow accounts because federal law is the only applicable "law" with respect to whether defendant is required to make such payments. Accordingly, defendant requests dismissal of the Fourth Cause of Action in the Complaint. (Def. Mem. Supp. Mot. Dismiss at 13–14, 19.) Plaintiffs argue in response that, as an ambiguous contract of adhesion, the mortgage agreement should be construed against the lender that drafted it and interpreted as expressly incorporating the New York escrow statutes. (Pls. Mem. Supp. Summ. J. at 18–21.)

As stated previously, the interest provision provides in relevant part:

Lender will not be required to pay me any interest or earnings on the funds unless either (i) Lender and I agree in writing, at the time I sign this Security Instrument, that Lender will pay interest on the Funds; or (ii) *the law requires Lender to pay interest on the Funds.*

(Pls. Rule 56.1 Stmt. ¶ 3 (emphasis added).) With respect to the governing law, the mortgage agreement states in relevant part that "this Security Instrument is governed by *federal law and the law that applies in the place* where the Property is located." (*Id.* (emphasis added).)

▆▆▆▆ Defendant's contentions present an issue of contract interpretation under New York state law. Contract interpretation presents a question of law for the court if the contract is clear and unambiguous. *See, e.g., United States ex rel. AWL Indus., Inc. v. Site Remediation Servs. Corp.*, 92 F.Supp.2d 132, 135 (E.D.N.Y.2000) (citing *Briarwood Towers 85th Co. v. Guterman*, 136 A.D.2d 456, 458, 523 N.Y.S.2d 98 (1st Dep't 1988)). Moreover, "[w]hether or not a writing is ambiguous is a question of law to be resolved by the courts." *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162, 566 N.E.2d 639, 565 N.Y.S.2d 440 (1990). "Where the terms of a contract are ambiguous and susceptible to more than one meaning, the court may consider evidence outside of the contract as an aid to interpret the meaning of the language that the parties chose." *United States ex rel. AWL Indus.*, 92 F.Supp.2d at 135. "The language at issue will be deemed ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Id.* (internal quotation marks omitted).

▆▆▆▆ Residential mortgage agreements such as the contract at issue in the present case frequently are preprinted form contracts of adhesion that are offered by lenders on a "take it or leave it" basis that deprives prospective borrowers the opportunity to negotiate terms effectively. *Jamaica Sav. Bank*, 390 F.Supp. at 1362; *see also In re Parker*, 269 B.R. 522, 530 (D.Vt. 2001). Plaintiffs assert, and defendant does not deny, that the mortgage in the present case is such a contract. Accordingly, we will interpret the terms of the agreement in accordance with the standards applicable to contracts of adhesion, and construe it against defendant in case of "doubt or ambiguity." *See, e.g., Jacobson v. Sassower*, 66 N.Y.2d 991, 993, 489

(citing *Dolman v. U.S. Trust Co. of N.Y.*, 2 N.Y.2d 110, 116, 138 N.E.2d 784, 157

N.Y.S.2d 537 (1956)).

N.E.2d 1283, 499 N.Y.S.2d 381 (1985) ("In cases of doubt or ambiguity, a contract must be construed most strongly against the party who prepared it, and favorably to a party who had no voice in the selection of its language."). Thus, as in the analogous insurance policy context, defendant as drafter has the burden of "establish[ing] that the words and expressions used not only are susceptible of the construction sought by [the drafter] but that it is the only construction which may fairly be placed on them." *Lachs v. Fid. & Cas. Co.*, 306 N.Y. 357, 365, 118 N.E.2d 555 (1954) (construing airline trip insurance policy purchased from vending machine).

■■■ New York contract law permits parties to incorporate by reference statutes as terms of their contracts. *See, e.g., Walter H. Poppe Gen. Contracting, Inc. v. Town of Ramapo*, 280 A.D.2d 667, 668, 721 N.Y.S.2d 248 (2d Dep't 2001). Indeed, although the preemption doctrine prohibits parties to a contract from electing to have state law govern over federal law, they nevertheless remain free to include as terms of their agreement state law directives that otherwise would be preempted by federal law. *See, e.g., Wells v. Chevy Chase Bank, F.S.B.*, 377 Md. 197, 224, 231, 832 A.2d 812 (2003) (construing credit card contract referring to state commercial law that had otherwise been preempted by HOLA and noting that "[w]hether the appellants' claims are preempted and whether the appellees contracted to comply with Subtitle 9 are separate and different questions, requiring differing analyses."), *petition for cert. filed*, (No. 03–918), 72 U.S.L.W. 3451, 2003 WL 23119164 (U.S. Dec. 22, 2003). State laws that become terms of the agreement between the contracting parties are enforceable by a breach of contract action, unless federal law has specifically preempted the breach of contract action as well. *See Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 233, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995) (con-cluding that the preemption provision of the Airline Deregulation Act of 1978 barred state consumer fraud statutory claims against airline, but permitted breach of contract actions based on ticket agreements). State law provisions may be included as contract terms either explicitly as text or incorporated by reference. *Wells*, 377 Md. at 228–29, 832 A.2d 812.

■■■ A general choice-of-law clause is, however, insufficient as a matter of law to incorporate by reference preempted state laws as the terms of a contract. Holding that "the 'law of the jurisdiction' includes federal as well as state law," the United States Supreme Court has concluded that parties did not agree to be bound by state or local law with respect to due-on-sale clauses when their agreement contained a provision stating that a "deed is to be governed by the 'law of the jurisdiction' in which the property is located." *de la Cuesta*, 458 U.S. at 158 n. 12, 102 S.Ct. 3014. The cases following *de la Cuesta* demonstrate that, in order to be considered more than just a general choice-of-law clause, a contract provision purporting to incorporate state law as a contract term must actually cite the relevant state laws to that effect. *Compare Gavey Props./762 v. First Fin. Sav. & Loan Ass'n*, 845 F.2d 519, 523 (5th Cir.1988) (concluding that the parties did not "contract out of the federal provision by specifically choosing Texas law in their loan agreements" when clause stated that " '[i]t is the intention of the parties hereto to conform strictly to the applicable laws of the state of Texas and the United States of America and judicial and/or administrative interpretations thereof regarding the contracting for, charging and receiving of interest for the use of detention of money.' "), *and MorEquity*, 118 F.Supp.2d at 898 n. 5 (concluding that preempted Illinois usury laws did not apply, despite mortgages' choice-of-law provision "indicating that the security in-

terest will be governed by federal law and the law of the jurisdiction in which the property is located"), *with Wells*, 377 Md. at 201, 231–32, 832 A.2d 812 (concluding that the parties incorporated by reference state statutes as contract terms when credit card agreement's governing law provision provided that "[t]his Agreement is made in Maryland. It is governed by Subtitle 9 of Title 12 of the Commercial Law Article of the Maryland Annotated Code and applicable federal laws.").[20]

■ Construing the choice-of-law provision in the present case against defendant, we conclude that, as a matter of law, that clause is unambiguous and does not in any way evince either party's intent to incorporate the New York escrow statutes into the agreement.[21] A clause providing that the agreement is "governed by *federal law and the law that applies in the place* where the Property is located," (Pls. Rule 56.1 Stmt. ¶ 3 (emphasis added)), does not

have the specificity required as a matter of law to incorporate otherwise preempted state statutes into the mortgage agreement, particularly when the Supremacy Clause implications are taken into account. Permitting such a broad choice-of-law clause to incorporate preempted state statutes as contract terms would defy the reality that the constitutional doctrine of preemption is as meaningful in New York as it is in the other forty-nine states.[22] Accordingly, we grant defendant's motion, deny plaintiffs' cross motion, and dismiss plaintiffs' Fourth Cause of Action.

### IV. *Plaintiffs' Fifth Amendment Claim*

■ Defendant contends that plaintiffs' alternative Fifth Amendment claim should be dismissed because its compliance with federal regulations rendering the payment of interest a matter of private choice does not constitute the state action requisite for a viable Takings Clause claim. (Def.

---

**20.** Indeed, in *Wells*, the Maryland Court of Appeals noted further that:

It is true that Subtitle 9 is a state law, as defined by 12 C.F.R. § 560.2(a) and, thus, falls within the category of state imposed obligations that regulation preempts. It is not true that Subtitle 9 is required by a state statutory regulation, ruling, order or judicial decision to be complied with in this case. *It is in this case only because the agreement between the parties refer to it and do so in the context of the notice to be given in the event that the agreement is amended.* Indeed, that agreement was prepared by Chevy Chase; it was not imposed on Chevy Chase as a matter of law.

377 Md. at 231 (emphasis added).

**21.** Plaintiffs state that after Atlantic Bank succeeded Yonkers as their mortgage servicing institution in 2002, Atlantic Bank paid them escrow interest under the same contract both originally and after refinancing. (Pls. Mem. Supp. Summ. J. at 21.) Plaintiffs claim that this action proves that the choice-of-law provision was intended to require the lender to pay interest on escrow accounts. (*Id.*) Assuming the relevance of Atlantic Bank's post-merger actions in divining the intent of its

predecessor-in-interest at the time that Yonkers entered into the loan agreement with plaintiffs, we cannot consider that subsequent conduct because we have concluded at the outset that the mortgage's choice-of-law clause is unambiguous as a matter of law. *See, e.g., Nat'l Bank of N. N.Y. v. Shaad*, 60 A.D.2d 774, 775, 400 N.Y.S.2d 965 (4th Dep't 1977) ("The language of the security agreements being clear and unambiguous, the subsequent conduct of the parties with respect to the transactions may not be considered for the purpose of varying or contradicting the plain meaning of the agreements."); *accord Hauser v. W. Group Nurseries, Inc.*, 767 F.Supp. 475, 485 (S.D.N.Y.1991).

**22.** Indeed, the New York legislature recognized the applicability of the preemption doctrine in this context, and specifically conflict preemption. N.Y. BANKING LAW § 14–b provides in relevant part that "In no event shall interest be required to be paid on escrow accounts where ... the payment of such interest would violate any federal law or regulation." *Id.* § 14–b(4)(ii).

Mem. Supp. Mot. Dismiss at 21–23.) Plaintiffs contend in response that it is the OTS Regulations themselves that are the unconstitutional state action because they take plaintiffs' escrow interest and give it to defendant, and that the taking of interest from the owner of the principal constitutes a taking under the Fifth Amendment. (Pls. Mem. Supp. Summ. J. at 24–25.) We conclude that defendant's failure to pay interest on plaintiffs' escrow account did not violate the Fifth Amendment Takings Clause.

■■■■ The Takings Clause of the Fifth Amendment to the United State Constitution prohibits a taking of private property for "public use, without just compensation." U.S. CONST., amend. V. It is beyond cavil that governmental action is required to trigger the application of this clause; it does not apply to private parties who are not state or governmental actors. *See, e.g., Fid. Fin. Corp. v. Fed. Home Loan Bank of S.F.*, 792 F.2d 1432, 1435 (9th Cir.1986) (acknowledging issue, but not deciding whether federal home loan bank was a governmental actor for Fifth Amendment purposes), *cert. denied*, 479 U.S. 1064, 107 S.Ct. 949, 93 L.Ed.2d 998 (1987); *N.Y., N.H. & H.R. Co., First Mortgage 4% Bondholders' Comm. v. United States*, 305 F.Supp. 1049, 1055 (S.D.N.Y. 1969), *vacated on other grounds sub. nom., New Haven Inclusion Cases*, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970). The state or governmental action requirement is satisfied if the complained-of conduct is "fairly attributable" to the state. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999). In *Cranley v. Nat'l Life Ins. Co. of Vt.*, 318 F.3d 105 (2d Cir.2003), the Second Circuit described the close public-private nexus required for conduct to be "fairly attributable" to the government:

For the conduct of a private entity to be "fairly attributable" to the state, there must be "such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" ... "The purpose of [the close-nexus] requirement is to assure that constitutional standards are invoked only when it can be said that the State is responsible for the specific conduct of which the plaintiff complains."...

The determination of whether the specific conduct of which the plaintiff complains constitutes state action is a "necessarily fact-bound inquiry." ... A challenged activity by a private entity may be deemed state action when the state exercises "coercive power," is "entwined in [the] management or control" of the private actor, or provides the private actor with "significant encouragement, either overt or covert," or when the private actor "operates as a willful participant in joint activity with the State or its agents," is "controlled by an agency of the State," has been delegated a "public function" by the state, or is "entwined with governmental policies." ...

*Id.* at 111–12 (citations omitted) (quoting, inter alia, *Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) and *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982)). A private entity is not, however, "a state actor where its conduct is not compelled by the state but is merely permitted by state law." *Cranley*, 318 F.3d at 112. Indeed, that a corporate entity is chartered by the government does not make it a government actor because "[a]ll corporations act under charters granted by a government" and "[e]ven extensive regulation by the government does not transform the actions of the regulated entity into those of the government." *S.F. Arts & Athletics, Inc. v. United States Olympic*

*Comm.,* 483 U.S. 522, 543–44, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987).

Indeed, compliance with applicable laws and regulations during the course of corporate conduct does not render a corporation a state actor, even if that conduct causes other parties to suffer some financial or other deprivation. For example, in *San Francisco Arts & Athletics,* the plaintiffs, promoters of the "Gay Olympic Games," claimed that the United States Olympic Committee (the "USOC") enforced the Amateur Sports Act granting it exclusive use of the word "Olympics" and associated symbols in a discriminatory manner that violated the Fifth Amendment's Due Process Clause. 483 U.S. at 543, 107 S.Ct. 2971. The Supreme Court held that the USOC was not a governmental actor, despite the fact that it was chartered and partially funded by Congress, and subject to other congressional requirements. *Id.* The Court concluded that the:

> USOC's choice of how to enforce its exclusive right to use the word "Olympic" simply is not a governmental decision. There is no evidence that the Federal Government coerced or encouraged the USOC in the exercise of its right. At most, the Federal Government, by failing to supervise the USOC's use of its rights, can be said to exercise "[m]ere approval of or acquiescence in the initiatives" of the USOC.

*Id.* at 547, 107 S.Ct. 2971 (alteration in original).

Similarly, in *Cranley,* the Second Circuit held that the reorganization of a domestic mutual insurance company into a stock insurance company, made in accordance with Vermont state insurance laws that required the approval of the insurance commissioner, did not constitute the state action necessary for the plaintiffs to state a claim under the Takings and Contract Clauses.[23] 318 F.3d at 109–10, 112. The court noted that "the State did not instigate the reorganization" and that the commissioner's role was limited to ensuring that the insurance company complied with disclosure requirements and that the reorganization would not prejudice insurance policyholders financially. *Id.* at 112. The Second Circuit stated that the reorganization "plan itself was voluntarily conceived, approved and executed by the management and membership of a private company." *Id.* at 112–13.

We conclude that defendant's failure to pay plaintiffs interest on their mortgage escrow accounts did not constitute a taking in violation of the Fifth Amendment because defendant, although a federally chartered savings and loan, was not a governmental actor. In the present case, defendant's actions constituted a permissible exercise of the options available to it under the applicable federal lending regulations. Indeed, plaintiffs have not submitted any evidence of governmental coercion or encouragement of defendant's conduct in drafting the escrow account interest clause of the mortgage loan agreement.[24]

---

**23.** *See also Tancredi v. Metro. Life Ins. Co.,* 316 F.3d 308, 313 (2d Cir.) (concluding in New York insurance demutualization case that "a regulatory agency's performance of routine oversight functions to ensure that a company's conduct complies with state law does not so entwine the agency in corporate management as to constitute state action"), *cert. denied,* —— U.S. ——, 123 S.Ct. 2610, 156 L.Ed.2d 628 (2003).

**24.** Accordingly, plaintiffs' reliance on *Phillips v. Washington Legal Found.,* 524 U.S. 156, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998) and *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980), for the proposition that the taking of interest from the owner of the principal by government action is a taking subject to the Fifth Amendment is unavailing because there has been no government action in the present case for purposes of that claim. (Pls. Mem. Supp. Summ. J. at 24–25.)

Accordingly, we dismiss plaintiffs' Sixth Cause of Action.

## CONCLUSION

For all of the foregoing reasons, defendant's Rule 12(b)(6) motion to dismiss the Complaint is granted in its entirety without leave to replead and plaintiffs' cross motion for summary judgment pursuant to Rule 56 is denied as moot.[25]

SO ORDERED.

---

**25.** The issue of liability having been decided entirely in defendant's favor, we need not address plaintiffs' Rule 23 class certification claims.